**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Edward KING and Mose Franklin Pearson, Defendants-Appellants.**

No. 74–3680.

United States Court of Appeals, Fifth Circuit.

Aug. 8, 1975.

Rehearing Denied Sept. 4, 1975.

Lawrence B. Sheffield, Jr., Don G. De-Coudres, Birmingham, Ala., for defend-ants-appellants.

Wayman G. Sherrer, U. S. Atty., J. Stephen Salter, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before COLEMAN, MORGAN and CLARK, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge.

Mose Franklin Pearson and Edward King were convicted of the importation of heroin, and of the use of the United States mail to further such importation, possession and distribution, under 21 U.S.C. §§ 952(a), 843(b), and 841(a)(1). They appeal, alleging that the government improperly obtained the heroin introduced into evidence against them. Finding that the government exceeded neither statutory nor constitutional limits, we affirm.

Viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence introduced at trial proved that King applied for and obtained a post office box at the Avondale branch Post Office, Birmingham, Alabama in late October, 1973. Shortly thereafter, approximately eighteen to twenty envelopes per week began arriving addressed to King at this box. The envelopes were uniformly of Christmas card size, were mailed from abroad, and bore the Army and Air Post Office (A.P.O.) return addresses of a small number of senders.

On December 4, Leo Lyle, the branch's acting manager, removed ten of these envelopes from the normal mail channels for possible inspection because they felt "thicker than an ordinary Christmas card." The envelopes had entered the United States at San Francisco and been routed to Birmingham without having been inspected. Lyle then gave the envelopes, which bore a single return address and the names of six senders, to a postal inspector, who in turn passed them on to Customs Supervisor Charles Sheehan and Agent Bernie Fenger of the Drug Enforcement Administration.

Agent Fenger first examined the envelopes by tapping them on a hard surface to test for any shift in position of an enclosed substance; the tapping produced a distinct pocket or cushion of powdery material. Sheehan immediately opened the envelopes, finding in each one a Christmas card which in turn held an inner packet containing a white powder; the substance responded positively to a field test for opium derivatives. The men removed a sample from each of the packets, replaced the packets in the envelopes and returned the envelopes to the Postal Service for delivery.

We need not trace the history of this case any further, since the only issue on

appeal is the legality of this search. It is sufficient to note that the opening of these envelopes represented the beginning of an investigation which terminated in the arrest of appellants and of two other co-defendants.

## I

Statutory authorization for the search is found in 19 U.S.C. § 482 (1965), which provides, in pertinent part, that a customs officer may "search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law . . .."

■ Appellants' argument that this section authorizes searches only in border areas seems to us without merit. It is true, of course, that most customs searches take place in such areas, but the very words of the statute negate an interpretation that would deny to agents the authority "to search any trunk or envelope, *wherever found* . . .", assuming of course that the other requisites for a valid customs search are met (emphasis supplied). Additionally, the statute specifically empowers customs officers to make such a search, "as well without as within their respective districts . . .."

■ Whether the government inspector had the required "reasonable cause to suspect" is likewise a question which need not long detain us. Case law emphatically demonstrates that much less than probable cause will suffice. In *United States v. Doe,* 472 F.2d 982 (2d Cir. 1973), *cert. denied,* 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691, for example, the court upheld a search by a customs official of a package mailed from South America and marked "old clothing," since the official's experience indicated that such a package might be falsely labeled. In *United States v. Swede,* 326 F.Supp. 533 (S.D.N.Y.1971), the court upheld the opening of an envelope from which some white powder had escaped, even though the powder reacted negatively to tests for heroin and cocaine. In

*United States v. Sohnen,* 298 F.Supp. 51 (E.D.N.Y.1969), customs officials were held not to have acted improperly in opening a heavy package which lacked a required label stating it could be opened for customs inspection and which spectroscopic examination revealed to contain twelve discs. Finally, in *United States v. Beckley,* 335 F.2d 86 (6th Cir. 1964), the court upheld the opening of a package weighing between nine and ten pounds because a customs clerk suspected that it contained something other than the two wall mats, four pillow cases and two dress robes declared on the outside of the box.

■ Sheehan likewise had "reasonable cause" to open the envelopes in question. The pattern of mail deliveries (numerous card size envelopes from a small group of senders with identical overseas addresses) is itself somewhat suspicious. When this factor is considered along with the envelopes' unusual thickness and the powdery cushion which appeared as the envelopes were tapped, it is apparent that Sheehan acted properly.

## II

We must next determine whether the opening of the envelopes violated appellants' Fourth Amendment rights.

■ The government has a traditional and well recognized right to examine both persons and merchandise entering the country. *See Cotzhausen v. Nazro,* 107 U.S. 215, 2 S.Ct. 503, 27 L.Ed. 540 (1883); *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *United States v. Beckley,* 335 F.2d 86, 88 (6th Cir. 1964), *cert. denied,* sub nom. *Stone v. United States,* 380 U.S. 922, 85 S.Ct. 921, 13 L.Ed.2d 807 ("Fourth Amendment standards applicable to mail matter moving entirely within the country are not applicable to mail matter coming in from outside the country at least where it appears that a customs determination must be made."). This right to search for possible customs violations extends

also to incoming first class mail. *United States v. Odland,* 502 F.2d 148, 151 (7th Cir. 1974), *cert. denied,* 419 U.S. 1088, 95 S.Ct. 679, 42 L.Ed.2d 680 (1974) ("Any person or thing coming into the United States is subject to search by that fact alone . . .. * * * [T]he Government is free to spot-check incoming international mail at the port of entry, or to inspect all such mail, or to inspect any such mail which attracts the inspector's attention.").

■ No court, however, has yet confronted the situation posed by this case, in which the search does not take place at a port of entry or border area. The question for decision is thus whether, given that the search would have been reasonable by Fourth Amendment standards if it had taken place in the San Francisco post office, it became unreasonable as a result of being conducted in Birmingham.

Appellants argue strenuously that reversal of the district court is compelled by *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (search of car on road that lies at all points at least 20 miles north of Mexican border, without probable cause or consent violates Fourth Amendment). In so contending, they misconstrue the thrust of that case.

It is true that the rationale of *Almeida-Sanchez* is that the Fourth Amendment's standards of reasonableness for searches at a border or its functional equivalent differ from the standards applicable to searches in the interior of the country, but the bases for this distinction are inapposite here. First, since travellers are aware that they may be subjected to a customs inspection at the border, they do not have a reasonable expectation of privacy as they do when travelling in the country's interior, *cf. Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harland, J., concurring). When crossing a border, they accept as reasonable an intrusion which would offend their right to personal security if conducted elsewhere. Second, the government's interest in policing the traffic crossing its borders is by definition protected most efficiently at the border itself or its "functional equivalent," for example, "an established station near the border, at a point marking the confluence of two or more roads that extend from the border . . .." *Almeida-Sanchez v. United States,* 413 U.S. 266, 273, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Finally, by searching only at a border or its functional equivalent, the government insures that it reaches only those individuals properly subject to such a search; obviously, this is not true of searches elsewhere.

None of these factors requiring reversal in Almeida-Sanchez is present here.[1] In the first place, of course, the letters themselves have no rights; it is the rights of their sender and addressee with

---

1. Nor is appellants' argument strengthened by *Almeida-Sanchez*'s progeny. In *United States v. Ortiz,* —— U.S. ——, 95 S.Ct. 2585, 45 L.Ed.2d 623, 43 U.S.L.W. 5026 (June 30, 1975), for example, the Court held that the Fourth Amendment forbids, in the absence of consent or probable cause, the search of private vehicles at traffic checkpoints not located at a border or its functional equivalent. The Court emphasized the "offensive" nature of the searches, noting that "the central concern of the Fourth Amendment is to protect liberty and privacy from arbitrary and oppressive interference by government officials." *Id.* at ——, 95 S.Ct. at 2588.

*United States v. Brignoni-Ponce,* —— U.S. ——, 95 S.Ct. 2590, 45 L.Ed.2d 630, 43 U.S.L.W. 5028 (June 30, 1975) holds that, ex-

cept at a border or its functional equivalent, roving Border Patrol officers may stop vehicles only if they are aware of specific facts and rational inferences therefrom which reasonably justify a suspicion that the vehicles contain aliens illegally in the country. Again, the Court stressed that the individual's reasonable expectation of privacy outweighed the increased efficiency such searches lend to law enforcement. *Id.* at ——, 95 S.Ct. 2580. These cases, then, rest on the same basic predicate as *Almeida-Sanchez,* that "the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.* at ——, 95 S.Ct. at 2579. We subject the instant search to such an analysis *infra.*

which we are concerned. Appellants here could have had no reasonable expectation that their letters, mailed from abroad, would remain uninspected. *See United States v. Odland,* 502 F.2d 148 (7th Cir. 1974), *United States v. Doe,* 472 F.2d 982, 985 (2d Cir. 1973). Having had no control over the envelopes from the time they entered the postal system until the time they were delivered, appellants naturally could not have known whether the envelopes had been opened, and if so, at what point in the postal process. Appellants were thus no more inconvenienced by the search in Alabama than they would have been by one in California. Finally, searches of this kind are, of course, "far less intrusive than searches of individuals or of their immediate effects." *United States v. Doe,* 472 F.2d 982, 984–985 (2nd Cir. 1973).

The government's interest, by contrast, is equally strong and is served equally well whether the search occurs in California or Alabama.[2] And since nothing can be added to or taken from an envelope while it is in transit, and since postmarks clearly identify envelopes from abroad, there is no danger analogous to that presented in *Almeida-Sanchez* that the government will search envelopes not "within the proper scope of official scrutiny . . .." *Almeida-Sanchez v. United States,* 413 U.S. 266, 271, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973).

The search at issue is more comparable to the search approved by this court in *United States v. Chiarito,* 507 F.2d 1098 (5th Cir. 1975). There, we rejected appellant's contention that, having passed through an initial customs checkpoint, but not having left the customs inspection area, he was immune from a further search by a roving customs officer. Here, the envelopes had passed an initial

stage in the customs process when they were routed to Alabama, but they were still in the process of being delivered, and still subject to customs inspection. Therefore, the search did not violate appellants' Fourth Amendment rights.

For the reasons stated, the decision of the district court is

Affirmed.

---

**2.** We do not rest our decision on the grounds that the search occurred at the functional equivalent of a border, but we note that the factual situation was quite similar to one given as an example in *Almeida-Sanchez, supra,* 413 U.S. at 273, 93 S.Ct. at 2539 ("[A] search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search." (Footnote omitted.)). For all practical purposes, the envelopes reached the end of a "nonstop flight" when they arrived in Birmingham.