UNITED STATES of America,
Plaintiff–Appellee,

v.

Ismael A. ESPERICUETA–REYES,
Defendant–Appellant.

No. 79–1497.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 15, 1980.

Decided Oct. 29, 1980.

**618**

Susan Wintermute, Phoenix, Ariz., for defendant–appellant.

John D. Lyons, Jr., Asst. U. S. Atty., Phoenix, Ariz., for plaintiff–appellee; Gary Schneider, Daniel R. Drake, Phoenix, Ariz., on brief.

Before SNEED, PREGERSON and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

Appellant Ismael Espericueta–Reyes appeals from his conviction for possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. Section 841(a)(1), and illegal importation of a controlled substance in violation of 21 U.S.C. Section 952. For the reasons stated below, we affirm the judgment of conviction.

*FACTS*

George Cons, a special agent with the Drug Enforcement Administration received information from a reliable source that a certain vehicle containing contraband and displaying a certain Arizona license plate was about to pass through the San Luis, Mexico Arizona Port of Entry (hereinafter "POE"). After some discussion, customs officials decided that they would allow the vehicle through the port but would place it under surveillance in order to determine whether others were involved with the driver–carrier in the smuggling of contraband.

At about 4:30 p. m. that vehicle entered the United States from Mexico. The car was driven by Jose Luis Martinez–Mendez, appellant's co–defendant at trial. The car was routed to secondary inspection [1] where it was searched, the first of three searches ultimately made by customs officers. No contraband was found, and the car was allowed to proceed; however, it was placed under surveillance and followed by customs officers as it was driven to various locations in San Luis, Arizona.

The car was continuously in the pursuing officer's line of sight except for several minutes during which it was lost from view. The car was eventually driven to a gas station where the driver put gasoline into the car. Appellant, standing by the gas pumps, handed the driver something which appeared to be money. After the driver paid for the gasoline he drove out of the station with appellant as his passenger. Approximately two or three minutes later, the officers stopped the vehicle at a spot about a mile from the POE by using red lights and sirens. A plain clothes officer, after identifying himself as a customs official, asked the defendants to step out of the vehicle.

The defendants were separated and each was patted down for weapons. Neither was handcuffed; they were not advised of their constitutional rights. Appellant and co–defendant were asked questions concerning the ownership of the car, and each stated that appellant was the owner.

A cursory inspection was made of the vehicle, but the dangerous condition presented by the traffic on the narrow highway made a more extensive search there impractical. The officer advised each man that he was not under arrest; however, he asked them to return to the POE "to clarify a few things."

At the POE the car was searched a third time and heroin was found concealed in the

---

1. During secondary inspection the trunk of the vehicle was searched, and Martinez–Mendez was asked some routine questions concerning his destination and the ownership of the vehicle. RT. 88.

right rear wheel well. Appellant and his co–defendant were detained for about 50 minutes during this search. After the heroin was found, appellant and his co-defendant were told they were under arrest, and were advised of their constitutional rights.

### 1. The Propriety of the Second and Third Vehicle Searches

Appellant first contends that the substance found pursuant to the second and third vehicle searches should be suppressed because those searches were not supported by probable cause.[2] According to the appellant, the first search of the vehicle at the POE "severed" the connection of the vehicle with the border; hence, the subsequent searches cannot be considered "extended border searches" and therefore had to be supported by probable cause. For the reasons stated below, we hold that each search made after the initial border crossing was a part of an extended border search which was reasonable and consonant with the Fourth Amendment.

■ Searches made at the time of an initial border crossing as well as searches which qualify as "extended border searches" need not be supported by probable cause. The right to search persons and containers at the border derives from the nation's right to control who and what may enter the country. *United States v. Ramsey*, 431 U.S. 606, 620, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 612 (1977); for that reason, the right to search at the border is extremely broad. Indeed, searches made at the border at the time of initial border crossing are reasonable within the meaning of the Fourth Amendment simply because they take place at the border. *Ramsey, supra*, at 616, 97 S.Ct. at 1978. A similar rule applies

to searches made after the border has been crossed where it is reasonably certain that any contraband which might be found on the suspected carrier was also present and concealed from inspection at the time of the initial border crossing. *Alexander v. United States*, 362 F.2d 379, 382–83 (9th Cir. 1966), *cert. denied*, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439; *King v. United States*, 348 F.2d 814, 816 (9th Cir. 1965), *cert. denied*, 382 U.S. 926, 86 S.Ct. 314, 15 L.Ed.2d 339 (1965).

The first question we must decide is whether the searches which occurred after the border was crossed were in fact extended border searches which did not have to be supported by probable cause. We hold that they were.

■ The fact that a prior search had been conducted at the time of the initial border crossing is not dispositive of whether later searches are properly considered extended border searches. See *United States v. Smith*, 629 F.2d 1301 at 1303 (9th Cir., 1980). *United States v. Terry*, 446 F.2d 579 (9th Cir. 1971), *cert. denied*, 404 U.S. 946, 92 S.Ct. 301, 30 L.Ed.2d 261 (1971); *United States v. Bowman*, 502 F.2d 1215, 1219 (5th Cir. 1974).[3] The criteria for determining whether a search may appropriately be demonstrated an "extended border search" are set forth in *Alexander v. United States, supra*. A search occurring after an initial border crossing any appropriately be denominated an "extended border search" when the totality of circumstances surrounding the search, including the time elapsed after the initial border crossing and the distance from the border, "are such as to convince the fact finder with reasonable certainty that any contraband which might

---

**2.** We view the second and third searches as part of an extended border search interrupted only because the dangerous conditions along the highway made it unsafe to conduct a more thorough search of the vehicle there. Similarly, the detention involved along the highway and at the POE five blocks away, should be viewed as a single detention pursuant to a single extended border search.

**3.** In *United States v. Bowman*, customs officials at the border became suspicious during their search of defendant's vehicle, but defendants were allowed to proceed. After a brief colloquy with other officials, the agent determined that the car should be searched more thoroughly. The defendant's car was found and stopped about two hours later and contraband was found. The 5th Circuit upheld the second search as a valid extended border search.

be found in or on the vehicle at the time of the search was aboard the vehicle at the time of entry into the jurisdiction of the United States." *Alexander v. United States, supra,* at 382.

As the *Alexander* Court noted, the task of policing the border is a difficult one; the work of customs officials is made far more effective by the identification of accomplices of the carrier bringing contraband into the United States. *United States v. Martinez,* 481 F.2d 214, 218 (5th Cir. 1973), cert. denied, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 489 (1974); *Alexander, supra,* at 382. For that reason, surveillance is often initiated as a person suspected of smuggling contraband crosses the border. A thorough search at the border is often deliberately delayed to avoid forewarning the individuals involved that surveillance is being undertaken. In some cases, as in *Alexander* no search is done at the time of the border crossing; in others, as in this case, a cursory search is performed. In either case the underlying rationale of "sweeping in" associates of the carriers supports either course of conduct.[4] Clearly, the task of policing our borders would be made far more difficult, and the illicit activities of smugglers less risky, if an inspection at the border automatically foreclosed subsequent inspections by customs officials absent probable cause.

This is not to say that limitless border searches of an international traveler's possessions by customs officials at any time or place are constitutionally permissible solely because it would make the task of border officials easier. The demands of effective law enforcement are often in tension with the requirements of the Fourth Amendment. See *Almeida Sanchez v. United States,* 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). Thus, any subsequent searches must at a minimum be reasonably related in both time and distance to the place and time of the initial border crossing. "Certainly there comes a point after a border crossing where an individual's relationship with the border is so attenuated that a search may not be justified as a "border search." *United States v. Bowman,* 502 F.2d 1215, 1219 (5th Cir. 1974); *United States v. Soto–Soto,* 598 F.2d 545, 548–49 (9th Cir. 1979); *Compare U. S. v. Smith, supra,* 629 at 1301.

The challenged searches in the matter before this Court were reasonably related in time and place to the initial border crossing. The vehicle, which was under virtually constant surveillance, was stopped in the general border area, within an hour and a half of the initial border crossing; the final search was conducted at the border itself, less than a mile from the place where the car was stopped.

■ Each of the requirements of the *Alexander* test for an extended border search were met under the circumstances of this case. The vehicle was virtually under constant surveillance from the time it was first searched at the border until the time that the car was stopped, with the exception of a few minutes during which it was lost from view. The subsequent searches occurred within an hour and a half of the time the vehicle entered the country, and were conducted at and near the border. These circumstances were sufficient to have convinced the fact finder with reasonable cer-

---

4. See *United States v. Smith, supra,* at 1301. Note, *From Bags to Body Cavities: The Law of Border Search,* 74 Column.L.Rev. 53, 70–71, n.96 (1974) [hereinafter *The Law of Border Search* ].

The phrase "sweep–in search" was coined in *The Law of Border Search, supra,* at 70. Not all extended border searches are concerned with "sweeping in" accomplices of the carrier of contraband. In some situations, a search is delayed in order to "bolster by further observation ... a suspicion that is arguably marginal at the time the border crossing was observed."

*United States v. Bilir,* 592 F.2d 735, 740 n.9 (4th Cir. 1979). In others, an extended border search is proper because customs officials are first alerted to suspicious circumstances immediately after the vehicle has left the inspection area. See, e. g., *Jones v. United States,* 326 F.2d 124 (9th Cir. 1963), cert. denied, 377 U.S. 956, 84 S.Ct. 1635, 12 L.Ed.2d 499 (1964); *United States v. Bowman, supra,* n.3; *United States v. Maggard,* 451 F.2d 502 (5th Cir. 1971), cert. denied, 405 U.S. 1045, 92 S.Ct. 1330, 31 L.Ed.2d 587 (1972). We express no opinion as to the constitutional parameters of these searches.

tainty that there had been no material change in the condition of the vehicle from the time it entered the United States until the time of the second search. Indeed, appellant's counsel conceded at oral argument that, the question of multiple searches aside, the surveillance in this case was sufficient to justify classification of the subsequent searches as extended border searches.

■■ Finally, as noted earlier, extended border searches need not be supported by probable cause: "mere suspicion" alone is clearly enough to justify such searches for purposes of customs law enforcement. *See Alexander, supra,* at 382. Far more than "mere suspicion" was present here. The customs agents in this case were acting at all times on the tip of a reliable informant that the vehicle in question contained contraband. This, along with the peculiar behavior of the appellant and his co–defendant at the service station, provided sufficient grounds to justify the stop along the highway and the subsequent searches of the vehicle.

Prior to the decision in *United States v. Ramsey,* the cases had generally held that the authority to search persons or containers after they leave the point of border crossing was more limited than the right to search at the actual border. *See, e.g., United States v. Bowman,* 502 F.2d 1215 (5th Cir. 1974); *United States v. Glaziou,* 402 F.2d 8, 13 n.3 (2nd Cir. 1968), *cert. denied,* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969); *See generally, The Law of Border Search,* 74 Colum.L.Rev. 53, 57 (1974). It was recognized that privacy interests protected by the Fourth Amendment play a more significant role after the traveler leaves the border itself. *See United States v. Glaziou, supra: See also Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.

543 (1925); *Zweibon v. Mitchell,* 170 U.S. App.D.C. 1, 516 F.2d 594, 631 n.93 (D.C. Cir. 1975), *cert. denied sub nom. Barrett v. Zweibon,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976).

*Ramsey* made clear that searches at the border itself were reasonable under the Fourth Amendment simply because they took place at the border. The question then arises whether a stricter standard of reasonableness for extended border searches remains intact after *Ramsey,* since such searches are for certain purposes the "functional equivalent" of searches at the border. *See United States v. Johnson,* 588 F.2d 147, 154 (5th Cir. 1979). We need not decide that question here, since there was ample cause supporting the extended border search which took place in this case.

### 2. Suppression of the Appellant's Statements

The appellant next argues that the statements he made at the roadside as to ownership of the vehicle should be suppressed because they were the fruits of an illegal detention.[5] Alternatively, appellant argues that, even if the detention of which he complains was proper, the statements he made during that detention should be suppressed because the detaining officers failed to give him the appropriate *Miranda* warnings.

■ Detentions during routine searches and questioning at the border are considered "reasonable" within the meaning of the Fourth Amendment. *See, Chavez–Martinez v. United States,* 407 F.2d 535, 539 (9th Cir. 1969) *cert. denied,* 396 U.S. 858, 90 S.Ct. 124, 24 L.Ed.2d 109 (1969); *United States v. Salinas,* 439 F.2d 376 (5th Cir. 1971). *Compare with United States v. Brignoni Ponce,* 422 U.S. 873, 95 S.Ct. 2574,

---

5. Appellant suggests that his brief detention along the highway was an arrest under our decision in *United States v. Beck,* 598 F.2d 497 (9th Cir. 1979). *Beck,* however, did not involve an extended border search and is factually distinguishable. In *Beck,* the defendants were riding in a taxi cab which was stopped after being boxed in by four patrol cars. Nine agents were involved. Six agents opened the Taxi's doors. Then two agents took each defendant by the arm to different locations where each was patted down and questioned. The overwhelming show of authority by the officers in effectuating the stop of the vehicle in *Beck* is not present in this case and, therefore, consideration of these facts under the *Beck* arrest standard is not warranted.

45 L.Ed.2d 607 (1975). The rule should be no different where the detention is pursuant to an extended border search. *Cf. United States v. Johnson,* 588 F.2d 147, 154 (5th Cir. 1979). The power to detain persons at the border while their possessions are searched derives from the nation's right to regulate who and what may enter the Country. *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 612 (1977). As we have noted earlier, the effective exercise of that right will occasionally require the detention of persons during extended border searches, often conducted miles from the border and hours after the initial border crossing. *Alexander v. United States, infra,* at 382; *See* note 8, *infra.* During such a search, some period of detention for those persons is inevitable. Nevertheless, so long as the searches are conducted with reasonable dispatch and the detention involved is reasonably related in duration to the search, the detention is permissible under the Fourteenth Amendment. *See also United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The same facts which supported the search in this case also justified the appellant's concomitant detention during that search. The search was conducted promptly, and the appellant was detained only while the search was being conducted. Under these facts, we find that the detention was well within the limits permitted by the Fourth Amendment.

Finally, the brief questioning of appellant which took place along the highway did not have to be preceded by *Miranda* warnings. Just as detentions during legitimate extended border searches do not constitute arrests, routine inquiries during extended border searches concerning ownership of the containers crossing the border do not, absent unusual circumstances, constitute "custodial interrogation" within the meaning of *Miranda. See United States v. Golden,* 532 F.2d 1244, 1246 (9th Cir. 1976) *cert. denied sub nom. Trowery v. United States,* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976); *Chavez–Martinez, supra,* at 539. Under the established law of the circuit, the warnings required by *Miran-*

*da* need not be given to one detained at the border "unless and until the questioning agents have probable cause to believe that the person questioned has committed an offense, or the person questioned has been arrested...." *Chavez–Martinez v. United States, supra.* We perceive no reason why a different rule should apply when such routine inquiries are made during an extended border search. Here, appellant was asked a routine question concerning ownership of the vehicle in which he was travelling. When so questioned he was not under arrest nor was there probable cause to believe that he had committed an offense. Under these facts, the *Miranda* warnings did not have to be given to the appellant.

### 3. The Alleged Rule 86 Violation

Appellant argues alternatively that the inculpatory statement he made along the highway should have been excluded because the government failed to disclose the statement to his attorney 15 days prior to trial, in violation of Local Rule 86 and Federal Rules of Criminal Procedure, Section 16(b).

Rule 16(a) provides in relevant part:

"Upon request of a defendant the government shall permit the defendant to inspect and copy ... the substance of any oral statement which the government intends to offer in evidence at the trial whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent. ..."

Similarly, Local Rule 86 states in relevant part:

"The United States Attorney, at least 15 days prior to trial, shall give written notice to the defendant through his attorney of any and all written or oral confessions, admissions, or statements of the defendant which the government intends to use during the course of the trial."

The government first learned of the statements in question the day before trial during a pretrial interview of a customs officer. While the record is not completely clear, it appears that the substance of the

appellant's statements as recalled by the officer were communicated orally to appellant's counsel that same afternoon, and that a written statement designating the areas covered by the statements was given to her the night before trial.

■ The mere fact that the requirements of Rule 86 were not complied with will not in itself bar the admission of statements into evidence where, as here, the government in good faith did not learn of the statements in time to comply with the rule. Under such circumstances the rule is substantially complied with if the government promptly discloses the substance of the newly discovered statements to defense counsel and promptly informs him or her of the government's intent to use the statements at trial. *See United States v. Anderson*, 509 F.2d 312, 323 (D.C. Cir. 1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975).

■ Late disclosure of inculpatory statements may, in certain circumstances interfere with a defendant's right to a fair trial, since substantial prejudice may result if counsel does not have adequate time to attempt to overcome the prejudicial effect of such evidence. *See United States v. Anderson, supra*, at 323–24. In such a case, it is the responsibility of defense counsel to bring the matter of potential prejudice to the attention of the court prior to trial and either request a continuance or move the court for a ruling excluding the objectionable testimony on due process grounds. Such a procedure will afford the defendant the opportunity for a full and fair hearing as to defendant's objections, and will allow the trial court to make an informed decision as to how best to deal with any prejudice the defendant might otherwise suffer.

■ In the matter before this Court, appellant failed to make a record as to how disclosure of the statement on the eve of trial prejudiced him.[6] Absent such a showing of prejudice, the trial court did not err in admitting the statement in question. *United States v. Arcentales*, 532 F.2d 1046, 1049 (5th Cir. 1976); *United States v. Eddy*, 549 F.2d 108 (9th Cir. 1976). Moreover, appellant did not utilize available procedures to mitigate any prejudice he might suffer because of late disclosure. While appellant's counsel did obtain a ruling at least temporarily excluding testimony concerning the contents of the statement during the pretrial motion to suppress,[7] counsel did not obtain a ruling on the admissibility of the statements for purposes of trial.[8] Significantly, appellant's co–defendant did request a ruling later in the hearing on the admissibility of the statements for purposes of trial, and the court indicated that it would make its ruling when the matter came up at trial.[9] Given appellant's failure to utilize available procedures to mitigate the prejudice he claimed to have suffered, or to develop a factual record on which his claim of prejudice could be evaluated, it

---

**6.** Clearly these statements may have been damaging to the appellant; however, that is not the sense in which the appellant must demonstrate prejudice. *United States v. Eddy*, 549 F.2d 108 (9th Cir. 1976). Rather, the appellant must show that the late disclosure of these statements under the circumstances made it unreasonably difficult for him to present his defense because he did not have time to prepare to meet new statements.

**7.** Appellant's written motion to suppress challenged the legality of the second search on the grounds that it was not supported by probable cause.

**8.** The colloquy was as follows:

Officer Badyl: I recall the driver indicated to me that the passenger was the owner of the vehicle, at which time I went to the passenger and asked him if he, in fact, was the owner of the vehicle. And he indicated–

Ms. Wintermute: Objection, your Honor.

The Court: Yes; just what happened after that. We don't want any conversations *at this point* with the driver. (Emphasis added)

**9.** The exchange was as follows:

Mr. Salazar: Your Honor, before I begin, could I get a clarification regarding conversations that any of these officials may have had with the defendants prior to their arrest; since they were noticed on those conversations I assume then that these are going to be limited for the purposes of this hearing only, is that correct?

The Court: Well, we will reach that when we get to it.

was not error for his statements to have been admitted.

### 4. The Alleged Bruton Error

Finally, appellant contends that he was denied his constitutional right of confrontation by the admission of his co–defendant's statement that appellant owned the vehicle in which the contraband was eventually found.[10] Neither appellant nor his co–defendant testified at trial; a customs officer testified that during their brief detention along the highway both the appellant and his co–defendant acknowledged that appellant owned the vehicle in question. Introduction of the co–defendant's statement, according to the appellant, violated the principles of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and was extremely prejudicial, since it provided virtually the only link connecting the appellant with that vehicle.

Under the facts of this case, we find that the admission of the co–defendant's statements was harmless beyond a reasonable doubt.[11] Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The statement of the co–defendant "interlocked" with and corroborated the identical statement made by the appellant as to ownership of the car. Even had the co–defendant's statement been excluded, appellant's identical admission would still have been properly before the jury. In such circumstances, there is little risk that the admission of the co–defendant's state-

ment will have the "devastating" impact on the defendant's case which concerned the Court in Bruton. See United States v. Walton, 538 F.2d 1348, 1352–54 (8th Cir. 1976), cert. denied, 429 U.S. 1025, 97 S.Ct. 647, 50 L.Ed.2d 628 (1976). Here, the connection of the appellant with the vehicle in question was independently established by the appellant's own admission, and the arguably self–interested statement of his co–defendant was merely corroborative of that admission. Under these circumstances we find that the admission of the co–defendant's statement was harmless beyond a reasonable doubt.

Judgment AFFIRMED.

---

10. The appellant at trial did not raise a constitutional objection to the admission of the co–defendant's statements. Nevertheless, under United States v. Longee, 603 F.2d 1342 (9th Cir. 1979), the confrontation objection cannot be waived, and is therefore properly before us on this appeal.

11. In the past, this circuit has followed the rule that admission of the confession of a non–testifying co–-defendant which "interlocked" with a confession by the defendant violated the principles of Bruton and required an analysis of whether admission of the co–defendant's statement was harmless beyond a reasonable doubt. Ignacio v. People of Territory of Guam, 413 F.2d 513 (9th Cir. 1969), cert. denied, 397 U.S. 943, 90 S.Ct. 959, 25 L.Ed.2d 124 (1970). We

adhere to that analysis in this case. We have no occasion to decide whether this circuit should adopt the principle set forth in the plurality opinion in Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). In that case, a plurality of the Supreme Court held that the admission of the "interlocking" confessions of a defendant and a non–testifying co–defendant did not violate the defendant's right of confrontation under Bruton so long as proper limiting instructions were given to the jury. In the instant case, no limiting instructions were requested by either defense counsel, and none were given. We note that the Eighth Circuit has declined to follow the plurality's analysis in Parker. See United States v. Parker, 622 F.2d 298, 301 (8th Cir. 1980).