UNITED STATES of America Plaintiff

v.

Osvaldo PEREZ RIVERA,
et al.   Defendants

No. CR. 02–229(SEC).

United States District Court,
D. Puerto Rico.

Feb. 28, 2003.

Jenifer Yois Hernández–Vega, U.S. Attorney's Office, Torre Chardón, Hato Rey, PR, for Plaintiffs.

José F. Blanco–Torres, Bayamón, PR, Rafael Castro–Lang, San Juan, PR, Esther Castro–Schmidt, San Juan, PR, Peter Diaz–Santiago, San Juan, PR, Joseph C. Laws and Héctor E. Guzmán–Silva, Federal Public Defender's Office, Hato Rey, PR, Ricardo Izurieta–Ortega, San Juan, for Defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Before the Court are the Co-defendants' motions to suppress the evidence seized during their arrests by Customs Officers in a Mayagüez shopping mall parking lot, and to dismiss the Indictment (Docket##48, 64, 68, and 70). The Government filed an opposition to said motions (Docket # 80), and the Court decided to hold an evidentiary hearing regarding the issues discussed in the motions and the opposition. After the conclusion of the hearing, the parties filed several supplemental briefs (Docket##93, 95, 100 and 102). Having considered the parties' arguments, and reviewed the relevant case law and the record, the Co-defendants' motions will be **DENIED.**

### Factual Background

The specific factual scenario surrounding the search and seizure of the Co-defendants and their vehicles is at the heart of the issues involved in their motions to suppress. Therefore, the Court held an evidentiary hearing in which most of the people involved in the relevant factual episodes were brought to testify. The Government and the Co-defendants presented two somewhat different versions of the facts. Nonetheless, the facts which are relevant to our analysis of the dispositive issues are pretty much uncontroverted. What differs greatly is the parties' interpretations as to how the law is to be applied to this set of facts.

At the suppression hearing United States Customs (Customs) Inspector Miguel Montalvo (Inspector Montalvo) testified that on June 5, 2002, he was assigned to the Mayaguez Port (the Port) Outbound Enforcement Team. On that date he conducted the inspection of Defendant Osvaldo Pérez Rivera. After releasing Defendant Pérez, and allowing him to continue his voyage to the Dominican Republic aboard the Millenium Express Ferry (the Ferry), Inspector Montalvo placed a "lookout" on Defendant Pérez and his automobile, due to the fact that he was somewhat

evasive when questioned about a large amount of cash which he was carrying.

On his return from the Dominican Republic on June 10, 2002, Defendant Pérez was referred by Inspector Montalvo to the Customs Secondary Inspection area (Secondary). On that date, U.S. Customs Canine Enforcement Officer Samuel Hernández (Inspector Hernández) was on duty at Secondary with his narcotics-detection dog Caspar (the dog), inspecting all incoming vehicles from the Dominican Republic. Among the passengers inspected with their vehicles was Defendant Pérez. The inspection of the Defendant and his vehicle was made under the heightened scrutiny attached to the "lookout," placed by Inspector Montalvo on the passenger and his vehicle on June 5. While Inspector Hernández and his dog conducted a "sweep" of the Mazda, Defendant Pérez and his baggage, were being checked by Customs Inspector Alberto Hernández. Defendant Pérez and his vehicle were allowed to continue because the dog did not detect any drugs, and no incriminating evidence was discovered. Defendant then exited the Customs inspection area and the Port.

Also on June 10, at approximately 7:50 a.m., and independent of what was going on with Defendant Pérez, Domiciano Martínez (Agent Martínez), a Puerto Rico Police Officer attached to the Customs Task Force, observed when arriving at the Port a black F150 Ford pick-up truck (the F150) with two persons inside. The F150 was parked in an area next to Gate 1 of the Port, with full visibility of the Ferry and of the area where cars and passengers disembark. According to Agent Martínez, there were no other cars close by. This allegedly arose his suspicion because during his then one-year tenure at the Port he had never seen a car parked in that area at that time. At approximately 9:05 a.m., this suspicion allegedly led to the surveil-

lance of the F150 by Agent Martínez, and another law enforcement officer. We shall assess the reasonability of these particular suspicions later on.

During the surveillance at the Port, Agent Martínez saw the F150, now followed by a blue Daewoo Nubira (the Daewoo) with two persons inside, move from Gate 1 to an area between Gates 3, and 4, where other people waited inside their cars for the passengers, and their cars, to disembark the Ferry. Agent Martínez then observed a Mazda 626 (the Mazda), driven by Defendant Pérez, leave the Port after disembarking from the Ferry and follow the F150 and the Daewoo. Agent Martínez testified that he never lost sight of the Mazda from the time it left the Port until it arrived at the Mayagüez University Plaza shopping mall (University Plaza), some two miles away. During this drive he noticed that the Mazda was traveling at a slower speed, and that the rear tires were "sort of like zig-zagging." Nevertheless, he testified that it was his opinion that the tires were in good repair. At approximately 9:30 a.m. Agent Martínez called for backup because he believed that the Mazda might be carrying contraband. Luis Classen (Agent Classen), another Puerto Rico Police Officer attached to the Customs Task Force, participated in the surveillance at University Plaza. According to his testimony, he did not lose sight of the Mazda, and was able to see three people inside the F150.

Once they arrived at the shopping center, the Agents continued the surveillance and observed that the Mazda 626 and Daewoo Nubira parked behind a Walgreen's store, and that the Ford F150 strategically parked at a point where the driver, Defendant Daniel de Armas, could observe both the vehicles and the surrounding area. At that time, Defendant de Armas was in the vehicle conducting what the agents be-

lieved to be counter-surveillance, and the passenger Defendant José Francisco Rivera was with the other Co-defendants, that is, Osvaldo Pérez Rivera, José Angel Martínez and Antonio Marrero, surrounding the Mazda 626. The Agents observed the Co-defendants trying to remove one of the rear tires from the Mazda 626 unsuccessfully.

The Agents requested backup to continue the surveillance without being detected by the Co-defendants. Other Agents arrived in vehicles to the shopping mall area to aid in the surveillance and parked strategically within the parking area of the mall. According to the Agents' testimony, the Mazda 626 was under direct surveillance at all times. The Agents then observed that the Co-defendants went to an adjacent Western Auto store to buy a lug wrench. At that time, the F150 transported the Co-defendants to the Western Auto and subsequently parked closer to that store. Once the lug wrench was bought, the Co-defendants returned to the Mazda 626 to attempt once again to remove the back tires. One of the tires was successfully removed and the Agents observed when one of the Co-defendants examined the tire and rolled the tire on the pavement. The tire was placed once again on the vehicle. The Co-defendants were observed moving to the other side of the Mazda 626, but as they were getting ready to remove the other back tire it appeared as though there was a change in plan and they opted not to do so. The tools were returned to the trunk. The Co-defendants began walking to the vehicles as though they were about to leave when the Agents determined to intervene.

As will become clear after our analysis, what happened during the intervention with Defendants, and during their arrests and the search of the vehicle's tires is unnecessary for the disposition of the case.

Therefore, the Court need not resolve the discrepancies in the versions of the facts presented by the parties as to what happened during and after the intervention. The threshold question at this point is only whether the intervention was permissibly initiated under the doctrine of the extended border search. Once this question is answered affirmatively, everything that happened after the intervention must be deemed legal and proper as part of a border search.

Before finally moving on to that analysis, however, we should note that the Co-defendants presented some evidence during the hearing that calls into doubt the reasonability of Agent Martínez's testimony regarding the suspicion aroused by the initial behavior of the passengers in the F150 and the Daewoo while waiting at the Port for Defendant Pérez. Ralph Otero (Mr. Otero) is a private investigator that testified on behalf of Defendant Antonio Marrero Martínez during the hearing. As part of his investigation, Mr. Otero conducted a surveillance of the Port area during three days, around the same time period when Agent Martínez claimed to have seen the suspicious behavior of the vehicles waiting outside the Port. This investigation produced numerous photographs, as well as several videos depicting the Port area. The videos depict the reality of people that gather in the Port area during the arrival of the Ferry, and the amount of vehicles that transit the street in front of the Port area. In particular, the video images belie agent Martínez's testimony that he never saw a vehicle parked so early in the morning in the area next to Gate 1. In fact, the Court finds it very hard to believe that the vehicle movements described by Agent Martínez would have seemed very suspicious at all. Nonetheless, it is also true that the law does not require any type of suspicion for Agents to begin a surveillance on individuals like

they did in this case. It might very well be the case that the initial surveillance was based on nothing more than a hunch. This, however, does not vitiate the reasonable suspicions that might have arisen later on, before any type of search or seizure triggering the protections of the Fourth Amendment took place. Bearing this in mind, let us go on and analyze the events that occurred between the time when the Co-defendants left the Port area, and the time when the Agents intervened, and how the law should be applied to those facts.

## Applicable Law and Analysis

The Co-defendants seek the suppression of the evidence seized after the Agents intervened with them for several reasons. First, they argue that the Agents had no reasonable suspicion to conduct an extended border search. Under the same rationale, they argue that the Agents had no reasonable suspicion to conduct a *Terry* investigatory stop. Further, they state that the Agents' intervention was not, in any case, a *Terry* stop, but rather amounted to *de facto* arrests. Of course, they claim, *a fortiori*, that no probable cause was present to justify their arrests. Finally, they argue that, even if the initial detention was legally conducted, the Agents illegally performed a search of the tires without obtaining a warrant, when the tires were already entirely within their control.

The Government, on the other hand, has offered several arguments to rebut the Co-defendants' allegations. However, we find that only one of them need be considered to validate the search. We find that the search and seizure of the Co-defendants and their vehicles was properly done pursuant to the Agents' authority to perform an extended border search.

■ "The Fourth Amendment commands that searches and seizures be reasonable. What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya Hernández*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *Id. citing United States v. Villamonte Márquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983); *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

In the present case, the Government argues that the search conducted was justified under the Fourth Amendment as an extended border search. Customs' authority to conduct border searches is very well established, both in statute and case law. The Supreme Court of the United States in *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), held:

> That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration . . .

> Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable

cause. This longstanding recognition that searches at our borders **without probable cause and without a warrant** are nonetheless "reasonable" has a history as old as the Fourth Amendment itself.

*Id.* (emphasis added).

██ Under the border search exception, routine searches of persons and effects of entrants at international borders are not subject to any requirement of reasonable suspicion or probable cause and these searches may be made without first obtaining a search warrant. Any person or thing coming into the United States is subject to search by that fact alone, whether or not there be any suspicion of illegality directed to the particular person or thing to be searched. *Montoya,* 473 U.S. 531, 105 S.Ct. 3304; *United States v. Beras,* 183 F.3d 22 (1st Cir.1999); *United States v. Robles,* 45 F.3d 1 (1st Cir.1995). "These cases reflect longstanding concern for the protection of the integrity of the border. This concern is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics." *Montoya,* 473 U.S. 531, 105 S.Ct. 3304 *citing United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

██ The authority to conduct a border search is based upon the inherent "right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *United States v. Ramsey,* 431 U.S. at 616, 97 S.Ct. 1972. *In United States v. 12 200–Ft. Reels of Film.* 413 U.S. 123, 125, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), Chief Justice Burger stated that "[i]mport restrictions and searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations. The Constitution gives Congress broad, compre-hensive powers 'to regulate commerce with foreign nations.' Art. 1, Section 8, cl. 3." "Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry." *Id.* at 125, 93 S.Ct. 2665. "The mere crossing of a border is sufficient cause for such a search." *United States v. Kallevig,* 534 F.2d 411, 413, n. 4 (1st Cir.1976).

However, as in this case, not all border searches occur at the actual international boundaries of the United States. Courts have recognized two different legal concepts for authorizing border searches away from the actual physical border: 1) searches at the functional equivalent of the border; and 2) extended border searches. According to the Government, it is the second doctrine which is controlling in the case at hand.

██ Even after a person or thing has gone beyond the border or its functional equivalent, courts have authorized searches conducted within the United States as border searches under the concept of an extended border search.

The rationale for these cases ... is grounded in part on the fact that the border has been crossed and additionally on the special need of law enforcement officials to defer apprehension of those suspected of being engaged in illegal smuggling activities in circumstances where surveillance may lead them to "higher-ups or other cohorts" in the illegal enterprise, or to further evidence of the criminal activity. Such searches require reasonable certainty that a border crossing has occurred and that conditions have remained unchanged from the crossing until the search. Because searches so delayed may involve a greater invasion of privacy than searches at the border or first practicable detention point, however, they may be conducted

without a warrant only if supported by reasonable suspicion.

*United States v. Garcia,* 672 F.2d at 1364 (11th Cir.1982)

■ Thus, searches occurring subsequent to a border crossing often also fall within the doctrine of the "extended border search." *United States v. Espericueta Reyes,* 631 F.2d 616, 619–20 (9th Cir.1980). Customs agents may learn or realize the significance of suspicious circumstances only after a vehicle or person has crossed the border. *Jones v. United States,* 326 F.2d 124 (9th Cir.1963). **The agents may delay a search in a reasonable effort to sweep in associates of suspected smugglers.** *Espericueta,* 631 F.2d at 620.

■ The extended border search doctrine allows for a greater spatial and temporal distance from the border than a search at the functional equivalent of the border. Thus, the courts have authorized border searches under this extended border concept in a variety of factual circumstances. *See, e.g., United States v. Walters,* 591 F.2d 1195 (5th Cir.1979) (strip search of international passenger while still in airport fifty-five minutes after she cleared Customs); *United States v. Martinez,* 577 F.2d 960 (5th Cir.1978) (second search of international passenger's luggage after following passenger to airport parking lot when initial Customs search had discovered cocaine in luggage); *United States v. Wardlaw,* 576 F.2d 932(1st Cir. 1978) (international passenger searched after initially clearing Customs and waiting for taxi at airport). Basically, the extended border search doctrine looks at factors such as time, distance, and continuous surveillance to establish to a reasonable certainty that the contraband found was not acquired after crossing the border or entering the United States. *See United States v. King,* 517 F.2d 350 (5th Cir.1975) (mail which entered in San Francisco still subject to Customs inspection in Birmingham, Alabama).

■ Under the extended border search doctrine adopted by several circuits, government officials may conduct a warrantless search beyond the border or its functional equivalent if the following three factors are satisfied: 1) the officials have reasonable certainty or a high degree of probability that a border was crossed; 2) they also have reasonable certainty that no change in the object of the search has occurred between the time of the border crossing and the search; and 3) **they have reasonable suspicion that criminal activity was occurring.** *United States v. Cárdenas,* 9 F.3d 1139, 1148 (5th Cir.1993). Reasonable certainty, in this context, has been defined as a standard which requires more than probable cause, but less than proof beyond a reasonable doubt. *See United States v. Gaviria,* 805 F.2d 1108, 1112 (2d Cir.1986); *Bond v. United States,* 529 U.S. 334, 338–39, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000).

■ We must bear in mind that the level of suspicion for extended border searches is stricter than the standard for ordinary border searches. *United States v. Alfonso,* 759 F.2d 728 (9th Cir.1985). Extended border searches occur after the actual entry into the country has occurred and intrude more on an individual's normal expectation of privacy than regular border searches. *Id.* Therefore, extended border searches must be justified by "reasonable suspicion" that the subject of the search was involved in criminal activity, rather than simply mere suspicion or no suspicion. *United States v. Caicedo–Guarnizo,* 723 F.2d 1420, 1422–23 (9th Cir.1984); *Garcia,* 672 F.2d at 1367.

The Court of Appeals for the Ninth Circuit, in *Alexander v. United States,* 362 F.2d 379 (9th Cir.1966), set forth the gen-

eral standards for searches that do not occur at the time of entry or in the immediate vicinity of the border. The Court held that the legality of the search must be tested by a determination whether **the totality of the surrounding circumstances,** including the time and distance elapsed as well as the manner and extent of surveillance, are such as to convince the fact finder with reasonable certainty that any contraband which might be found in or about the vehicle at the time of the search was aboard the vehicle at the time of entry into the jurisdiction of the United States. *Id.* at 382. This is equivalent to the standard set by the Fifth Circuit Court in *Cárdenas.* Thus, we need to determine whether the totality of facts and circumstances within the Customs officers' knowledge warranted a reasonable certainty that the contraband they sought had crossed the border. "Where the contraband is not discovered immediately upon entry, **continuity of surveillance over the subject of the search** is a factor in determining identity, and hence enters into the totality of circumstances." *Alfonso,* 759 F.2d 728 (emphasis added) *citing Caicedo–Guarnizo,* 723 F.2d at 1422.

■ This means that under the extended border search doctrine, "searches need not necessarily occur at the instant a vehicle arrives at the border or at its functional equivalent." *Id.* And perhaps most importantly to the case at bar, we must remember that **the fact that some search occurred at the time of the initial border crossing simply does not prevent later searches from coming under the rules of border searches.** *Id. citing Espericueta,* 631 F.2d at 619.

■ Lastly, we must bear in mind during our analysis that, in this case, all of the Co-defendants came in contact with the border crossing and were therefore the object of a border search. When an individual has direct contact with a border area, or an individual's movements are reasonably related to the border area, that individual is a member of a class of persons that Customs officers may, if their suspicions are aroused, stop and search. *See United States v. Rogers,* 504 F.2d 1079 (5th Cir.1974); *Bolger v. United States,* 189 F.Supp. 237 (S.D.N.Y.1960) *affd. sub nom., Bolger v. Cleary,* 293 F.2d 368 (2d Cir.1961); *rev'd on other grounds,* 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390 (1963).

■ In making reasonable-suspicion determinations, reviewing courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. *United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). **It is particularly important to stress that the "totality of the circumstances" approach to making reasonable-suspicion determinations allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.** *Id.* Finally, the Supreme Court has also stated that in reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences from suspicious behavior, and cannot reasonably demand scientific certainty when none exists. *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Thus, the reasonable suspicion determination must be based on commonsense judgments and inferences about human behavior. *Id.* With all this in mind, let us take a look at the particular facts before us.

■ In this case, before Defendant Pérez's arrival, Customs Task Force

Agents assigned to the Ferry Port noticed a 1998 Ford F150 pick-up, belonging to Defendant de Armas and a 1998 Daewoo Nubira station wagon parked on an adjacent street to the Ferry pier. From that position, the persons in these cars had a clear view of the Ferry's arrival. Although we have already stated that the Court does not find the Co-defendants' behavior at this point in time to be suspicious, the Court does believe the Agents' uncontroverted testimony that their surveillance of Co-defendants began at this point, regardless of why that surveillance was started. Once Defendant Pérez went through Customs, the Agents observed him driving up to the F150 and Daewoo Nubira vehicles. Immediately thereafter the three cars drove off together and the Agents followed them until they reached the University Plaza Shopping Center in Mayagüez. The Agents found it strange that the three cars followed and escorted each other without the occupants stopping to talk or welcome Defendant Pérez, who had just arrived from the Dominican Republic. In contrast with the other statements by the Agents regarding the allegedly suspicious behavior of the Co-defendants at the Port area, the Agents' reaction to this specific part of the individuals' behaviors seems reasonable to the Court.

**The credible and uncontroverted testimony given by the Agents established that they maintained constant surveillance of the Mazda throughout the journey.** At some point during that short journey, two things happened which could have reasonably caused the Agents to suspect wrongdoing. First, the Agents were notified that the Mazda and its driver had been the subject of a "lookout" due to the suspicions that had arisen in a fellow Customs Officer's mind when Defendant Pérez had passed the Customs inspection on his way to the Dominican Republic with a big quantity of cash, with no reasonable explanation. Second, the Agents noticed that the rear tires of the Mazda were wobbling, even though they seemed to be in good repair.

Once at the shopping area, the Agents observed that some of the cars' occupants attempted to remove and examined closely the left rear tire of the Mazda while the driver of the F150, Defendant de Armas, remained in his vehicle apparently serving as look-out. This further aroused the Officers' suspicions. The Agents continued surveillance and observed the Co-defendants removing one of the tires and further examining it. The Agents saw the Co-defendants roll the tire around and pick it up and shake it. At this point, the Court understands that the Agents reasonably suspected that there might be some type of contraband inside the otherwise normal-looking tires. After all, the only reasonable explanation the Court can think of for picking up a tire and shaking it in an attempt to see if it was in good repair, would be that the person performing such an operation thought there was something loose inside the tire. Although one could, of course, say that that does not mean what was inside the tire was contraband, given the rest of the suspicious circumstances surrounding the factual scenario, the Court believes it was reasonable for the Agents to suspect that contraband was being smuggled before their eyes. The Agents' suspicions were then somewhat confirmed by the fact that instead of replacing the wobbling tire, the Co-defendants just put the tire back on and prepared to depart.

At this point in time, then, the uncontroverted testimony shows that the Agents had seen the Mazda cross the actual border, and had maintained it under constant surveillance. Under these circumstances, the Court must conclude that it was rea-

sonably certain that the object of the eventual search had in fact crossed the border and that its contents had remained intact. Therefore, the first two prongs of the extended border search doctrine are met. In addition, as discussed above, the Court has found that the Agents had obtained enough information during their surveillance of the vehicles to have a reasonable suspicion that there was contraband being smuggled in the Mazda. Hence, the third and final prong of the test is also met. As such, the Agents could properly proceed to conduct an extended border search, with all the liberties of a traditional border search, of the Co-defendants.

Furthermore, as we mentioned before, since all the Co-defendants had been closely related to the entry of the vehicle and the suspicious behavior that occurred afterwards, the Agents were justified in detaining all of them as part of the extended border search. Of course, the weapons found incident to the detainment of the individuals under the border search authority were not illegally seized. Once this had been done, the Agents did not have to obtain a warrant to perform the search of the vehicles' tires, either, since the previously cited case law makes clear that no warrants are necessary when conducting a search pursuant to the border search powers of the Government. Hence, the Agents legally brought Caspar, the dog, conducted a second sweep of the Mazda, this time letting air out of the tires, and got a positive response from the dog, indicating the presence of illegal narcotics in the tires. At that point, it is beyond question that the Agents had probable cause to arrest all the Co-defendants. Therefore, we find that the search and seizure of the Co-defendants and their vehicles was done pursuant to a valid extended border search. As such, the suppression of the evidence obtained would be unwarranted.

## Conclusion

For all the reasons discussed above, we find that the Co-defendants' Fourth Amendment rights were not violated. As such, their motions to suppress and dismiss are **DENIED**.

**SO ORDERED.**