Alice HEIDY, National Central American Health Rights Network, et al., Plaintiffs,

v.

UNITED STATES CUSTOMS SERVICE, et al., Defendants.

No. CV86–2365–JSL(Px).

United States District Court,
C.D. California.

March 2, 1988.

Barrett S. Litt, Litt & Stormer, Los Angeles, Cal., David Cole, Center for Constitutional Rights, New York City, for plaintiffs.

Donna Eide, U.S. Attys. Office, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

LETTS, District Judge.

This is a case of first impression. It involves a constitutional challenge to the procedures adopted by the United States Customs Service ("Customs") for enforcement of 19 U.S.C. Section 1305 ("Section 1305"). Section 1305 prohibits, among other things, the importation of certain written materials into the United States. Specifically, Section 1305 provides in pertinent part:

> All persons are prohibited from importing into the United States from any foreign country any book, pamphlet, paper, writing, advertisement, circular, print, picture, or drawing containing any matter advocating or urging treason or insurrection against the United States, or forcible resistance to any law of the United States....
>
> Upon the appearance of any such book or matter at any customs office, the same shall be seized and held by the appropriate customs officer to await the judgment of the district court as hereinafter provided.... Upon the seizure of such book or matter such customs officer shall transmit information thereof to the United States attorney of the district in which is situated the office at which such seizure has taken place, who shall institute proceedings in the district court for the forfeiture, confiscation, and destruction of the book or matter seized. Upon the adjudication that such book or matter thus seized is of the character the entry of which is by this section prohibited, it shall be ordered destroyed and shall be destroyed. Upon the adjudication that such book or matter thus seized is not of the character the entry of which is by this section prohibited, it shall not be excluded from entry under the provisions of this section.

Plaintiffs in this action[1] ("Plaintiffs") are all United States citizens from whom written materials were seized upon their reentry into the United States from Nicaragua. In some instances, an initial review was made by Customs officials to determine whether the questioned materials urged "treason or insurrection" in violation of Section 1305 ("Section 1305 Review" or "Review"). In others, Customs sought the assistance of the Federal Bureau of Inves-

---

1. For reasons of improper joinder, all plaintiffs with the exception of plaintiffs Heidy, Manuel, Miller, Rabinowitz, Rose, Walker, and Rogers were dismissed from the action.

tigation ("FBI") in making its determination. Photocopies were made of some of the detained materials. In addition, in some, if not all cases, the agency conducting the review made permanent records reflecting at least the identity of the person from whom the materials were seized, a description of the contents of the materials reviewed, the place from which the materials were being imported, the purpose of the review, and the determination made by the reviewer. None of the materials reviewed, however, were ultimately determined to violate Section 1305.

After the Section 1305 Review was completed, most of the original materials were returned to Plaintiffs,[2] and in most cases, the copies were not retained by Customs.[3] The records, reports and/or notes relating to materials found *not* to be prohibited by Section 1305 ("Records of Non–Violation"), however, were not returned to the Plaintiffs, and thus were retained by Customs and other agencies, including the FBI.

## I. HISTORY OF THE LITIGATION

### A. THE COMPLAINT

Plaintiffs brought this action for declaratory and injunctive relief charging that Customs' practices and procedures exhibited a pattern of misenforcement and misapplication of Section 1305, such that all persons returning from Nicaragua were threatened with an invasion of their constitutional rights. At the time their complaint was filed, Plaintiffs' primary conten-

tion was that the materials had been seized by Customs officials who had received no training of any kind on the constitutional limitations or applications of Section 1305 and that the seizures had been made upon the basis of nonuniform, entirely subjective determinations of whether the materials were or might be subversive.

### B. THE POLICY DIRECTIVES

Without conceding that Plaintiffs were correct in their position, Customs responded promptly and provided two successive policy directives (collectively the "Policy Directives") which addressed many of the problems raised by Plaintiffs.[4]

The Policy Directives express Customs' current policy and set clear standards regarding the appropriate methods to be used by Customs when enforcing Section 1305.[5] Under the Policy Directives, Customs reserves the right to disseminate to the FBI and other agencies any materials related to the Section 1305 Review. The FBI, however, refuses to be bound by any limitations on its own policies or procedures which might follow from the Policy Directives.[6]

## II. DISCUSSION

### A. MOOTNESS

On the basis of the Policy Directives, Customs urges that Plaintiffs' original claims against it are now moot. *See, e.g., DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974);

---

2. There is some dispute as to whether all of the materials were in fact returned. According to one plaintiff, Mr. Rose, three of the detained items were never returned, but the Government's documents search and employee interviews indicated that all items were returned.

3. In at least one case, it cannot be determined what happened to the photocopies since none of the photocopied material was found.

4. Customs Directive 3300–04 entitled *Review, Copying and Seizure of Documents* was issued on June 12, 1986, and Customs Directive 2210–01 entitled *Restrictions on Importation of Seditious Matter* was issued on August 29, 1986.

5. The Policy Directives include the adoption of the *Brandenburg* criteria, *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430

(1969); a 14–day time limit on the retention of materials; various standards of suspicion and probable cause for retention, copying and seizing documents; provision for immediate judicial review whenever a decision is made to seize or copy materials; and strict limits on dissemination and other use.

6. Indeed, it is the FBI's stated policy that originals or copies of any such documents which come into FBI possession may be retained if relevant to any FBI investigation and that documentary evidence will be returned to the owner only after it is determined that the item no longer has any evidentiary, prosecutive, or investigative value.

*Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1950–51, 23 L.Ed.2d 491 (1969). Plaintiffs concede that the Policy Directives adequately address their concerns as to the procedures in which Customs determines whether certain materials should be seized for the purpose of further review.[7]

Plaintiffs do not agree, however, that appropriate procedures have been established as to what is done with materials *after* they have been seized at the border. On the contrary, Plaintiffs assert that the post-seizure handling of the materials threatens Plaintiffs, as a matter of express and consciously adopted policy, with the same violation of constitutional rights which they suffered in the absence of any policy.

Under the Policy Directives, once a decision is made that the seized materials do not violate Section 1305, the original materials are to be returned to the owner and all copies of the materials are to be destroyed. The Policy Directives, however, do not address whether Customs may create, retain or disseminate Records of Non-Violation. Accordingly, there is both a reasonable expectation that a violation of Plaintiffs' rights will recur and that the interim relief provided by the Policy Directives has not "completely eradicated" the alleged violations of Plaintiffs' constitutional rights. *See Halet v. Wend Investment Co.*, 672 F.2d 1305, 1307–08 (9th Cir. 1982). The Court holds, therefore, that Plaintiffs' claims have not been mooted by the adoption of the Policy Directives.

## B. STANDING

■ Customs further argues that Plaintiffs lack standing to pursue their claims.

In order to have standing, a plaintiff must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ... and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

Customs argues that Plaintiffs lack standing because the Policy Directives have never been applied to them and there is no real threat that application of the Directives will produce in the future the kind of harm which they suffered before the Directives were promulgated. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The Court does not agree.

Plaintiffs all allege that they have current plans to travel to Nicaragua[8] or elsewhere abroad from where it is likely that they will wish to return with written materials which, although not in fact proscribed by Section 1305, might nevertheless be validly seized at the border under the Policy Directives and subjected to a Section 1305 Review. Plaintiffs assert that the dissemination of seized materials to other agencies and the creation and retention of the Records of Non-Violation all have a substantial "chilling effect" on the free exercise of rights guaranteed to them by the first amendment.[9] If Plaintiffs are denied the relief they seek, they will continue to be exposed in the future to the same harm they have suffered in the past. According-

---

7. It must be noted, of course, that the voluntary cessation of illegal conduct does not ordinarily make a case moot. *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

8. All Plaintiffs intend to return to Nicaragua. One of the plaintiffs is a nurse and health educator and plans to return to Nicaragua for health-rights work. Another plaintiff operates a political bookstore and intends to travel to Nicaragua again for business purposes. Two of the plaintiffs are university professors whose research and academic commitments will require

them to return to Nicaragua as part of their academic work.

9. *Cf. Hess v. Indiana*, 414 U.S. 105, 108, 94 S.Ct. 326, 328–29, 38 L.Ed.2d 303 (1973); *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 508–09, 89 S.Ct. 733, 737–38, 21 L.Ed.2d 731 (1969) ("it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.")

ly, Plaintiffs have standing to pursue their claims.[10]

## C. CONSTITUTIONALITY OF CUSTOMS' POLICY

Customs urges that as to any materials which have been lawfully seized for purposes of a Section 1305 Review, Customs has the right to make records concerning such materials, and to make the materials available for inspection by other governmental agencies, regardless of the ultimate determination of violation or nonviolation of Section 1305.

### 1. *Rights of Agencies Other Than Customs*

■ Congress has imposed upon Customs the duty to seize materials proscribed by Section 1305, and "to transmit information thereof" to the United States Attorney. Section 1305 does not prohibit Customs from utilizing the expertise reposed in other agencies, such as the FBI, to determine whether the materials are proscribed under Section 1305. This does not suggest, however, that if Customs seeks the assistance of other agencies in making a Section 1305 Review the other agency would be able to encroach further on Plaintiffs' constitutional rights than would Customs itself.

The assistance provided to Customs by other agencies is merely a practical accommodation and is not authorized by the statute. Any rights that another agency might have to the materials seized for purposes of a Section 1305 Review therefore are purely derivative. *United States v. Soto-Soto*, 598 F.2d 545, 549 (9th Cir.1979). Accordingly, if another agency, such as the FBI, participates with Customs in actions enforcing the statute, it does so as a subordinate agency and is subject to the same rules and restrictions that regulate Customs' officers in their enforcement activities. *Id.*

### 2. *Creation, Retention and Dissemination of the Records of Non–Violation*

■ Plaintiffs contend that Customs should be enjoined from making and retaining Records of Non–Violation. Plaintiffs further contend that Customs should be enjoined from permitting another agency to review the seized materials when such other agency does not agree to refrain from making Records of Non–Violation. As to both contentions, the Court agrees.

a. *Border Search Exception:* It is well established that searches and seizures by Customs officials at our international borders are subject to lesser fourth amendment protections than are domestic searches made in connection with general law enforcement objectives. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 3309–11, 87 L.Ed.2d 381 (1985). Under the "border search exception," routine Customs inspections may be conducted without probable cause, and, under certain limited circumstances, more intrusive warrantless searches may be justified by a level of suspicion less than probable cause. *Soto–Soto*, 598 F.2d at 548–49.

Plaintiffs do not seriously dispute the application of the border search exception to the initial search and seizure of the materials in question.[11] Instead, Plaintiffs assert that the proper scope of the border search exception to the fourth amendment ends at the point at which, under the Policy Directives, the substantial encroachment on their first amendment rights begins. That is, Plaintiffs contend that *after* a de-

---

**10.** Customs reliance on *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) is misplaced. In *Lyons*, the Court held, inter alia, that the plaintiff lacked standing because the challenged government conduct was contrary to an express governmental policy. *Id.* at 110, 103 S.Ct. at 1669–70. Customs here, however, is asserting its right to employ, in future routine investigations, the policy of keeping and disseminating the Records of Non–Vio-

lation, the very practices which Plaintiffs are challenging here.

**11.** Specifically, Plaintiffs do not contest that at the border Customs has the right to routinely search their belongings on a warrantless basis, to seize anything as to which there is probable cause to believe that it is connected with illegal activity, and to record the existence of anything which is found in plain view in the course of a lawful search.

termination of nonviolation of Section 1305 has been made the first amendment prohibits the creation or retention of Records of Non–Violation. The Court agrees.

The knowledge of what an object is or appears to be may be obtained from a lawful search and seizure. *See, e.g., United States v. Ramsey*, 431 U.S. 606, 623–24, 97 S.Ct. 1972, 1982–83, 52 L.Ed.2d 617 (1977). A limited reading or perusal of writing that appears on objects sought to be imported inevitably may be required for the purpose of identifying the objects themselves.[12] However, a reading for the purpose of revealing the *intellectual content* of the writing requires encroachment upon first amendment protections far beyond the mere search and seizure of materials.[13] Border search cases relaxing fourth amendment standards solely for the purpose of facilitating detection of physical objects sought to be imported unlawfully therefore are inapposite to this case.[14]

In enacting Section 1305, Congress prohibited the importation of materials "advocating or urging treason or insurrection against the United States," and authorized Customs to seize materials "appearing" to violate the statute. In order to enforce the statute to prevent the unlawful importation of treasonous materials, a paradox arises because customs officials are necessarily required to violate fundamental first amendment rights of law-abiding citizens who wish to bring written materials into the country which do not violate Section 1305.

This creates a major constitutional concern. It is the very essence of the first amendment freedom of expression [15] to protect the rights of citizens to expound their beliefs, even where the beliefs are unpopular or express dissent.[16] There can be no

---

**12.** *See Ramsey*, 431 U.S. at 623, 97 S.Ct. at 1982; *United States v. Cardona*, 769 F.2d 625, 628–29 (9th Cir.1985); *United States v. King*, 517 F.2d 350, 354 (5th Cir.1975); *United States v. Odland*, 502 F.2d 148 (7th Cir.1974).

**13.** Indeed, in *Ramsey*, in the context of the border search exception, the Court noted the critical distinction between the opening of envelopes to determine content (heroin) from the *reading* of material contained in the envelopes. *Id.* at 623, 97 S.Ct. at 1982. Specifically, the Court noted, "Here envelopes are opened at the border only when the customs officers have reason to believe they contain other than correspondence, while the reading of any correspondence inside the envelopes is forbidden." *Id.* at 624, 97 S.Ct. at 1982–83.

It was not necessary for the Court to consider the reach of the first amendment, however, because the reading of correspondence was "flatly prohibited" by postal regulations. *Id.* at 623, 97 S.Ct. at 1982.

**14.** "The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *Ramsey*, 431 U.S. at 620, 97 S.Ct. at 1980–81. The purpose of the border search exception, therefore, was to facilitate the detection of unlawful attempts to bring physical objects into this country which are deemed by Congress to be contrary to the public interest. Firearms, diseased foods and more recently controlled substances (drugs) provide ready examples of the kinds of products or physical objects which justify substantial intrusions at the border on the constitutional rights of per-

sons with respect to search and seizure. *See, e.g., King*, 517 F.2d at 352.

**15.** *See Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Bond v. Floyd*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). The classic formulation of the principle is found in Justice Brandeis' concurring opinion in *Whitney v. California*, 274 U.S. 357, 375–76, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J. concurring):

> Those who won our independence believed ... that public discussion is a political duty; and that this should be a fundamental principle of the American government.... [T]hey knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedies for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

**16.** *See Brandenburg*, 395 U.S. at 447, 89 S.Ct. at 1829, *New York Times v. Sullivan*, 376 U.S. 254, 273–75, 84 S.Ct. 710, 722–23, 11 L.Ed.2d 686 (1964). The limitation on such expression, of course, is "where such advocacy is directed to

dispute that the reading of the materials in question and the creation and retention of the Records of Non–Violation "chill" Plaintiffs' rights of expression.

b. *Scientology:* Customs relies upon the opinion of the distinguished Judge William Gray in *Church of Scientology v. Simon,* 460 F.Supp. 56 (D.D.Cal.1978), *aff'd,* 441 U.S. 938, 99 S.Ct. 2153, 60 L.Ed.2d 1040 (1979), for the proposition that, for purposes of enforcing Section 1305, the border search exception to the fourth amendment applies equally to situations in which first amendment rights are encroached upon by the reading of seized materials. *Scientology* does not go nearly this far.

As the first case decided under Section 1305 which addressed the permissible scope of intrusion upon expressions protected by the first amendment,[17] *Scientology* posed many important questions which for purposes of this case may be regarded as settled.

First, *Scientology* raised the question of whether written materials may be constitutionally excluded from importation, *in any circumstances,* based solely on their alleged "treasonous" nature. As to this *Scientology* held that some such prohibition may be constitutionally imposed, but the statutory prohibition of Section 1305 must be limited in scope to materials not protected by the first amendment which incite "imminent lawless action" according to the standard set forth in *Brandenburg v. Ohio.*[18] *Scientology,* 460 F.Supp. at 58.

Second, recognizing that definitive decisions as to materials which do contravene Section 1305 would inevitably require an encroachment on the rights of citizens seeking to import materials which are protected by the first amendment, the court in *Scientology* did *not* go so far as to hold that Customs officials have unlimited discretion to read any and all written materials which they find in the course of routine border searches. Instead, the court held that the potential for intrusion upon first amendment rights required that Customs must first conduct an initial search to "scan or peruse and perhaps even read" the incoming materials before a more intrusive search may be conducted. *Id.* at 59. A second level more intrusive search[19] is justified only when upon the basis of the initial scan or perusal there is "real suspicion"[20] that the statute may be violated. *Id.* at 59–60.

*Scientology* permits this second level more intrusive search only for the purpose of making an informed decision as to whether the materials in question violate Section 1305. *Id.* at 60. No matter what *other* suspicion or concern may be revealed by the initial limited Customs review, if that review does not produce real suspicion that importation of the materials in question will violate Section 1305, they may not be read at all. Finally, once the review has been made, *Scientology* holds that Customs may *continue* "searching, detaining and copying the documents" without a search warrant, pursuant to the plain view doctrine.[21] *Id.* at 60. It is from this final

inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg,* 395 U.S. at 447, 89 S.Ct. at 1829. *See generally San Diego Comm. v. Governing Bd.,* 790 F.2d 1471, 1478–79 (9th Cir.1986).

**17.** *Cf. United States v. 12 200 Foot Reels of Super 8mm Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed. 2d 500 (1973) (obscene materials are not protected expressions and may be prohibited from importation by Section 1305 without discussion of rights of permissible scope of inspection).

**18.** 395 U.S. 444, 89 S.Ct. 1827 (1969).

**19.** Here, in *Scientology* Judge Gray provided a graphic showing of how significant this second level intrusion may be regarded by equating the intrusive searches encroaching upon first amendment protections with intrusive strip

searches. *Scientology,* 460 F.Supp. at 59 (citing *United States v. Wilmot,* 563 F.2d 1298 (9th Cir.1977)).

**20.** Recent decisions cast doubt on the validity of the "real suspicion" standard. *See, e.g., Montoya de Hernandez,* 105 S.Ct. at 3310–11. The appropriate standard that might justify a more intrusive search, however, is not currently at issue and therefore this court declines to decide whether this standard still applies.

**21.** Under the plain view doctrine, law enforcement officials are authorized to seize, without a warrant, any evidence of crime as to which they inadvertently come upon in plain view regardless of whether that evidence was one of the original objects of the search so long as the official has a proper justification for being coin-

holding that Customs seeks to draw the most comfort in this proceeding. Customs contends that the Second Policy Directive affords no more latitude than that expressly approved in *Scientology.*

This contention is invalid. *Scientology* stands only for the proposition that when a Section 1305 Review has been lawfully made, the reviewer is not constitutionally required to blind himself to evidence relating to some crime of which there is an existing basis for suspicion.[22] As applied to the materials read in the course of a Section 1305 Review, the plain view doctrine would permit Customs to consider as in "plain view" evidence of any crime committed by the person from whom the materials were legitimately seized which was revealed by the reading. *Id.*[23]

c. *Plaintiffs' Claims:* As applied to the Plaintiffs' claims here, once a determination of nonviolation has been made, by hypothesis, there can be no evidence of a violation of Section 1305. If the Section 1305 Review also has not produced in "plain view" any evidence relative to any other crime,[24] the plain view justification for retaining the materials therefore runs out. In such a situation, the creation and retention of Records of Non–Violation with respect to the seized materials is not within the holding of *Scientology.* As to these materials, Plaintiffs' claims here present a case of first impression.

Once a determination has been made that there has been no violation of Section 1305, and the Section 1305 Review has produced no other evidence of crime, Records of Non–Violation can serve only a purpose which is peculiarly obnoxious under the first amendment—that of preserving a permanent record of persons who might be deemed to be "subversive" or "anti-administration" based solely upon a presumption that what Plaintiffs read reflects what they think. While the Policy Directives give more precision to the procedures by which materials may be seized at the border for further review, there can be no doubt that materials seized under the Directives would reflect political views of some kind.[25] The mere existence and retention of the Records of Non–Violation, therefore, threaten Plaintiffs with future seizures and can have no effect but to impermissibly "chill" Plaintiffs' conduct in the future as to their constitutionally protected expressions.[26]

---

cidentally in the position to come upon the incriminating evidence. *Scientology,* 460 F.Supp. at 60 (citing *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968)). *See also Arizona v. Hicks,* —— U.S. ——, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).

**22.** *Id.* at 60 ("The customs officers had a right to inspect the shipments and could seize any evidence of *another* crime, under the 'plain view' doctrine, without first obtaining a search warrant" (emphasis added)).

**23.** It is clear from *Scientology,* therefore, that, consistent with this Court's holding, it is the plain view doctrine, and not the border search exception, that justifies *further retention* of the materials. *See Scientology,* 460 F.Supp. at 60.

**24.** The Supreme Court's recent decision in *Arizona v. Hicks,* —— U.S. ——, ——, 107 S.Ct. 1149, 1153–55, 94 L.Ed.2d 347 (1987), suggests that in order to seize the materials as evidence related to an *independent* crime, the plain view doctrine requires that what was revealed in plain view would have to establish independent probable cause of a violation of the independent crime, or be relevant to the investigation of a crime as to which independent probable cause already exists.

**25.** It must be noted that the "real suspicion" which justifies subjecting particular materials to a more intrusive search under the *Brandenburg* standard is almost certain to be based upon the fact that the first review shows them to be "subversive" or "dissenting" by some standard.

**26.** To cause such records to be made and kept pursuant to the ostensible future enforcement of Section 1305 deserves equally short attention. As discussed above, it is clear that such records cannot be retained for any legitimate purpose related to the future enforcement of the statute. *See also Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 508, 89 S.Ct. 733, 737 (1969) ("in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."); *Gay Students Org. v. Bonner,* 509 F.2d 652 (1st Cir.1974) ("Mere 'undifferentiated fear or apprehension' of illegal conduct ... is not enough to overcome First Amendment rights, and speculation that individuals might at some time engage in illegal activity is insufficient to justify regulation by the state.") Furthermore, the limited search and seizure authority that is granted to Customs applies only to the enforcement of customs laws, and cannot be a justification for general law enforcement objectives. *See United*

Finally, it must be noted that the Policy Directives propose absolutely no limit on the kinds of Records of Non–Violation which Customs is permitted to keep. The Court is not required to go so far as to hold that no carefully drawn policy [27] could withstand constitutional scrutiny. Under the Policy Directives, however, there is no limit on the kinds of records which may be made and included as Records of Non–Violation. It must be noted that in the past, in the absence of policy, personal diaries, phone books and personal notes were seized "for completeness" once *some* materials had been discovered which met the threshold test for seizure. Under the Policy Directives there is still the possibility that such associated materials may be seized along with the materials which justified the more intrusive Section 1305 Review, and that permanent records also may be retained of these very personal matters which have absolutely no connection with the legitimate purposes of Section 1305. The chilling effect of this risk upon the exercise of first amendment rights of law-abiding citizens cannot be defended on the basis of any legitimate statutory purpose, and therefore also is constitutionally impermissible.

## D. INJUNCTIVE RELIEF

██ Customs does not contest the Court's power to grant declaratory relief. Instead, Customs contends that injunctive relief is inappropriate because there is no "real and immediate threat" that Plaintiffs will be the subject of unconstitutional action. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 1666–1667, 75 L.Ed.2d 675 (1983). As discussed above, if Plaintiffs are denied the relief they seek, they will continue to be exposed in the future to precisely the harm they have suffered in the past, namely the dissemination by Customs of the materials in ques-

tion and the retention of the Records of Non–Violation. *Cf. Honig v. Doe & Smith,* —— U.S. ——, ——, 108 S.Ct. 592, 602, 98 L.Ed.2d 686 (1988). Accordingly, injunctive relief is appropriate in this case.

## III. CONCLUSION

Based on the foregoing, the papers filed herein, the stipulated uncontroverted facts, oral argument, and good cause appearing;

IT IS HEREBY ORDERED that:

1. Once it is determined that seized materials do not violate 19 U.S.C. Section 1305, no records may be made or retained which describe the content of the seized material or from which the identity of the person from whom the materials were seized may be ascertained.

2. Once it is determined that seized materials do not violate 19 U.S.C. Section 1305, all originals of the materials must be returned to the owner of the materials and all copies must be destroyed.

3. The United States Customs Service is enjoined from providing to any other agency any materials, or copies thereof, detained for a determination of seizability under 19 U.S.C. Section 1305 unless:

(a) such other agency agrees to comply in all respects with Customs' policy regarding such materials, as limited by the terms hereof, and

(b) such other agency agrees to return the materials, and all copies, records, notes, and memoranda relating thereto, to Customs for disposition in accordance with Customs policy.

---

*States v. Soto–Soto,* 598 F.2d 545, 549–50 (9th Cir.1979); *Alexander v. United States,* 362 F.2d 379 (9th Cir.1966). *Cf. United States v. Harrington,* 681 F.2d 612, 614 (9th Cir.1982) ("Because [the border search exception] creates an exception to standard constitutional practices, we enforce its limitations with great care.")

**27.** For example, a policy might be adopted which would permit no more than that records be made of the fact that a particular reviewer had reviewed particular materials, without disclosure of the person from whom they were seized. Such a policy would pose very different issues from those posed here.