UNITED STATES of America,
Plaintiff,

v.

Nelson SOTO–TERAN, and Martha
Lindo de Diaz, Defendants.

No. 95 CR 0705(SJ).

United States District Court,
E.D. New York.

Sept. 23, 1996.

Zachary W. Carter, United States Attorney, Brooklyn, New York City by David Hennessy, Assistant United States Attorney, for U.S.

Edward Jenks, Mineola, NY, Ephraim Savitt, New York City, for Nelson Soto–Teran.

David W. McAndrews, Mineola, NY, Denis P. McAllister, Zornberg and Hirsch, Williston Park, NY, for defendant.

## ORDER

JOHNSON, District Judge.

Upon consideration of the Report and Recommendation of Magistrate Judge Marilyn D. Go, dated August 5, 1996, and the limited objections thereto filed by defendant Martha Lindo de Diaz ("Lindo"), this Court determines that the Report and Recommendation will be affirmed and adopted.

Defendant Lindo objects to the admissibility of the letter found in Soto's briefcase during the border search. This Court agrees with Magistrate Go's reasoning and reading of the cases regarding this issue, and also notes the particular circumstance in this case that the letter, initially perused and eventually photocopied by U.S. Customs Service Inspector McNamara, was in fact addressed to the U.S. Customs Service. Tr. 73.

It is hereby

ORDERED that (1) that the motions to suppress the letter found in Soto's briefcase during the border search be DENIED; (2) that the motion to suppress the contents of Soto's briefcase seized during the consent search of Londono's apartment be DENIED; (3) that the motion to extend the hearing and for issuance of a subpoena directing Fannie Londono to testify be DENIED; and (4) that the motion to suppress Soto's post-arrest statements be DENIED.

SO ORDERED.

## REPORT AND RECOMMENDATION

GO, United State Magistrate Judge.

Defendants in this action have been indicted for conspiracy and substantive charges relating to the importation and distribution of cocaine. The Honorable Sterling Johnson, Jr., by order dated January 26, 1996, has referred defendants' suppression motions to me to report and recommend. Defendants Nelson Soto–Teran ("Soto") and Martha Lindo Dediaz ("Lindo") have both moved to suppress physical evidence seized from Soto during a border search, and defendant Soto has moved to suppress physical evidence seized from his briefcase during a warrantless search of an apartment where he was staying as a guest, as well as certain post-arrest statements. During the hearing of the suppression motions on June 10, 1996, Soto moved to extend the hearing and for issuance of a subpoena directing Fannie Londono, a witness, to testify.

For the following reasons, I respectfully recommend that all the motions be denied.

## PRIOR PROCEEDINGS

At a pretrial conference on November 14, 1995, Judge Johnson directed that defendants submit motions by December 15, 1995 and the Government serve its opposing papers by December 29, 1995. He later extended defendant Lindo's time to serve her motion papers and the Government's time to reply.

I scheduled a suppression hearing for March 14, 1996. Because the defendants, who were in custody, were not produced for the hearing, I heard brief oral argument that day. At the conclusion of that hearing, I gave counsel an opportunity to supplement their papers, but none made any additional submissions.

The hearing was not held until June 10, 1996 due to a change in counsel for Lindo. On May 1, 1996, I granted the application of Lawrence Berger, Esq. to be relieved as

counsel for Lindo due to a potential conflict arising from prior representation of a witness. Denis McCallister, Esq. then appeared as newly retained counsel for Lindo.

## FINDINGS OF FACT

An evidentiary hearing was held to determine the lawfulness of a border search conducted at Miami International Airport, of a search conducted at Fanny Londono's apartment, and of statements obtained by agents in questioning Soto. The Government called Special Agent Dominick Lopez, Special Agent Stephen Delcasino, and Inspector Jay R. McNámara of the United States Customs Service to testify on the events leading to the procurement of the evidence in question. I found the witnesses generally to be credible and have based my findings of fact on their testimonies with one exception. Soto and Lindo did not present any witnesses.

In addition, the Government called Special Agent Patrick Ahearne to testify about the origins of the investigation in order to rebut Lindo's argument that the initial unlawful search and seizure of a document upon Soto's border entry tainted the subsequent evidence seized in this action. Because I need not reach the question of whether the subsequent evidence is "fruit of the poisonous tree," Ahearne's testimony will not be discussed.

*Soto's Entry*

On June 29, 1995, Soto arrived at Miami International Airport aboard American Airlines flight 960 from Cali, Colombia. Because Colombia is considered a source country for narcotics, the Miami Customs Services assigns a "Rover Team," customs inspectors in plain clothes, to meet this flight daily. Transcript ("Tr.") at 49–50. Prior to landing, an announcement is made on the plane to the passengers to have their passports open to the picture page for inspection. Tr. 51. Inspector Jay R.

McNamara (McNamara), who is fluent in Spanish, met passengers deboarding flight 960 at the jetway to inspect their passports. *Id.*

McNamara stopped Soto for initial questioning in Spanish because Soto appeared nervous. When Soto handed his passport to McNamara, McNamara observed that Soto's hands were shaking, sweat appeared on his brow, and he would not make eye contact with McNamara. Tr. 52. Upon further questioning regarding the nature of Soto's trip, McNamara observed that Soto became increasingly nervous and gave evasive and inconsistent answers. Tr. 54. When asked about his profession, Soto first responded that he drove a taxi, but then stated that he was a salesperson. *Id.* Soto first explained that the purpose of his trip was business, but then said it was business and pleasure. Tr. 55. McNamara also ascertained that Soto's ticket was bought in cash a day or two before the flight's departure. Tr. 53. Based on Soto's suspicious behavior, the inspector decided to conduct a further investigation of Soto at a secondary questioning room. Tr. 55.

McNamara accompanied Soto to an area secluded from the general public view on the first floor where Senior Inspector Jamie Cordero ("Cordero") joined them. Tr. 56. McNamara asked Soto if everything within Soto's briefcase and bag belonged to him and Soto replied affirmatively. Tr. 57.

During an inspection of Soto's briefcase, McNamara found a sealed envelope.[1] Tr. 58. McNamara opened the envelope and found a letter written in English addressed to the United States Customs Service and Tampa Airlines. Tr. 59. Without stopping to ask for Soto's consent, McNamara proceeded to read the letter, which described a shipment of paper and identified Soto as the new consignee. *Id.; see* Government Exhibit 5. In response to McNa-

---

1. I did not find McNamara's testimony that he found a file folder inside Soto's briefcase to be credible. Throughout his testimony McNamara referred to the alleged folder as an "envelope" five times and then corrected himself.

mara's questions regarding the letter, Soto informed McNamara that the letter was to be delivered to Lindo. Tr. 82. McNamara read the letter to Soto in Spanish, and asked Soto if he was the consignee of the shipment. Soto denied knowledge of the contents of the letter. Tr. 60. Throughout the questioning, McNamara observed that Soto was extremely nervous, very evasive and began to sweat profusely. Tr. 61.

When Soto refused to answer questions to McNamara's satisfaction, McNamara ripped up the letter in anger and threw the pieces in a garbage can. *Id.* McNamara observed that Soto appeared to be relieved. Tr. 62. Cordero immediately told McNamara that he should not have destroyed the letter. The agents then retrieved the torn pieces of paper and taped them back together. After photocopying the patched letter, they returned it to Soto. *Id.* They also examined the contents of Soto's wallet and telephone book and photocopied various pieces of paper, documents and business cards contained therein. *See* Government Exhibit 11. After the inspection, McNamara allowed Soto to enter the country.

*Soto's and Lindo's Arrest*

On July 8, 1995, the Government obtained an oral warrant to enter a warehouse identified as 747 Intercargo Services in Queens and to search for three rolls of paper and packaging material. Tr. 5; *see* Government Exhibit 12. The customs agents had previously searched the shipment of paper on July 5, 1995 and found several lead boxes containing cocaine inside one of the three rolls of paper bearing a red and white label. *See* Government Exhibit 12 at 4. On July 10, 1995, agents of the Customs Service entered the warehouse to execute the warrant and arrested Soto there. Agents later arrested Lindo at her home. *See* Government's Memorandum of Law in Opposition to Defendant Soto's Pretrial Motions at 6.

*Soto's Post–Arrest Questioning*

At the time of Soto's arrest, Special Agent Dominick Lopez ("Lopez") ques-

tioned Soto. Tr. 113. As discussed in greater detail on the record in my findings of fact at the conclusion of the hearing, I found that Lopez properly gave Soto *Miranda* warnings in Spanish after Soto's arrest, and that Soto answered questions by Lopez and Ahearne after knowingly and voluntarily waiving his *Miranda* rights.

*The Search of Londono's Apartment*

In the course of executing the warrant at the warehouse, Special Agent Stephen Delcasino ("Delcasino") questioned Fannie Londono ("Londono"), a secretary for 747 Intercargo Services. She advised that she resided in apartment 2D at 147–44 73rd Avenue in Flushing and that Soto was staying with her as a guest. Tr. 24; *see* Government's Memorandum of Law in Opposition to Defendant Soto's Pretrial Motions at 5. Delcasino asked in English if Londono would consent to a search of her premises and she agreed. At his request, she also signed a written consent to search form in Spanish. Tr. 25; *see* Government Exhibit 1. Londono understood Delcasino's questions and remained pleasant and cooperative throughout the questioning. Tr. 26. As the agents drove to her apartment, she gave them directions in English. Tr. 27.

Londono led the agents to the apartment door and let them in with her key. *Id.* In the living room, the agents found on a couch an open attaché case which Londono said belonged to Soto. Tr. 29. In the briefcase, agents saw the original red and white label that had been on the roll of paper, airline tickets, a date book, a Colombian passport in the name of Soto, and miscellaneous papers. Agents seized these items. Tr. 30.

### DISCUSSION

I. THE BORDER SEARCH AND SEIZURE OF THE LETTER

 A. CLAIM OF DEFENDANT NELSON SOTO–TERAN

The Government possesses the burden of establishing the legality of a warrantless

search and seizure, *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), *reh'g denied*, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980), by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Soto challenges the lawfulness of the search and seizure of the letter by customs officials when he entered this country.

At the border, customs agents have broad statutory authority to conduct warrantless searches. 19 U.S.C. § 1582 (1980)[2]; *United States v. Marti*, 321 F.Supp. 59, 62 (E.D.N.Y.1970); *see also United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir.1986) (broad authority of customs officials to conduct warrantless border searches without probable cause). This authority "is based upon the inherent 'right of the sovereign to protect itself by stopping and examining persons and property crossing into this country.'" *Gaviria*, 805 F.2d at 1111 (quoting *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)). Although such authority is limited by the reasonableness requirement of the Fourth Amendment, *United States v. Villamonte-Marquez*, 462 U.S. 579, 585, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), a routine customs search is reasonable simply because it occurs at the border. *Ramsey*, 431 U.S. at 616, 97 S.Ct. 1972; *United States v. Jerome-Oboh*, 883 F.Supp. 917, 921 (W.D.N.Y.1995). A person entering the country is deemed to consent to a routine search and cannot have any "subjective expectation of privacy." *United States v. Sanders*, 663 F.2d 1, 3 (2d Cir.1981) (citing *United States v. Nieves*, 609 F.2d 642, 645 (2d Cir.1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980)). A routine search may include "a person's luggage, personal belongings, outer clothing, wallet, purse, and even one's shoes." *United States v. Turner*, 639 F.Supp. 982, 986 (E.D.N.Y. 1986) (quoting *United States v. Grotke*, 702 F.2d 49, 51–52 (2d Cir.1983)).

To conduct a search which goes beyond a routine inspection, a customs agent must have reasonable suspicion "justified by a particularized and objective basis for suspecting the particular person of smuggling contraband." *United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). Such "reasonableness" is determined "by weighing the warranted suspicion of the border official against the offensiveness of the intrusion." *United States v. Sanders*, 663 F.2d 1, 3 (2d Cir.1981) (quoting *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir.1978)); *United States v. Moody*, 649 F.2d 124, 127 (2d Cir.1981). In general, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck much more favorably to the Government at the border." *Montoya de Hernandez*, 473 U.S. at 540, 105 S.Ct. 3304.

■ Although the Second Circuit has not expressly addressed whether customs officials may open envelopes when conducting routine border searches, other circuit courts have recognized that customs officials have "unlimited discretion" to search packages. *United States v. Taghizadeh*, 41 F.3d 1263, 1266 (9th Cir.1994); *see also United States v. Glasser*, 750 F.2d 1197, 1200–05 (3d Cir.1984), *cert. denied*, 471 U.S. 1018, 105 S.Ct. 2025, 85 L.Ed.2d 306 (1985); *United States v. Pringle*, 576 F.2d 1114, 1116 (5th Cir.1978). This is a logical application of the broad authority given to customs officials to conduct border searches and to inspect locked luggage and personal belongings. Otherwise, an individual could stymie officials simply by

---

**2.** 19 U.S.C. § 1582 states:

> The Secretary of the Treasury may prescribe regulations for the search of persons and baggage and he is authorized to employ female inspectors for the examination and search of persons of their own sex; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations.

wrapping contraband in packages or enclosing it in envelopes. Since Soto had no legitimate expectation that he could conceal the letter from customs officials simply by placing it in a sealed envelope, I find that McNamara properly opened the envelope in Soto's briefcase as part of a routine border search. *See also Ramsey,* 431 U.S. at 620, 97 S.Ct. 1972 (Justice Rehnquist noted concession during oral argument that envelopes carried by a person crossing the border could be searched without probable cause or a warrant).

 The next issue is whether the reading and photocopying of the letter violated Soto's Fourth Amendment rights, another issue that the Second Circuit has not expressly addressed.[3] Other circuit courts have upheld the reading and photocopying of documents during border searches, but have required the existence of reasonable suspicion. *See United States v. Schoor,* 597 F.2d 1303, 1306 (9th Cir.1979) (air cargo bills and other documents were properly seized by custom officials upon notification that items were instrumentalities of crime involving narcotics); *United States v. Fortna,* 796 F.2d 724 (5th Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986) (upheld photocopying of documents and a map found in a carry-on bag during a border search because the documents aroused the agents' suspicion of illegal conduct involving material or persons entering or leaving the United States). As discussed above, a perusal of documents or letters to identify the nature of the documents and to verify that they contain no contraband or dutiable items would clearly fall within a routine border search since such an intrusion is minimal. However, once a search of a sealed envelope or package reveals no contraband or dutiable items, a close reading of the contents of documents could intrude on a person's privacy since such documents could deal with very personal matters, such as a

diary or desk calendar. Thus, I recommend that this Court follow the Fifth and Ninth Circuits, and apply a reasonable suspicion standard in determining the lawfulness of the actions of border officials in closely reading and photocopying documents.

In the case at bar, McNamara had more than sufficient reasonable suspicion to justify a search beyond a routine inspection from the first time McNamara questioned Soto. Soto's flight originated from Colombia, a notorious source country for drugs. Soto was nervous and gave evasive and contradictory answers when initially questioned. Thus, McNamara had reasonable grounds to suspect that the letter pertained to the importation of dutiable items or contraband. *See United States v. Charleus,* 871 F.2d 265, 269 (2d Cir.1989) (factors for reasonable suspicion include excessive nervousness of the suspect and origination of suspect's flight from a known source country for drugs). He was justified in reading the letter, although his conduct in tearing up the letter was, at best, unprofessional.

 Furthermore, although the letter in the envelope was not contraband nor a dutiable item, it was addressed to the United States Customs Service. Soto's subsequent refusal to answer questions and denial of knowledge about the shipment of paper in which he was named the new consignee further validated McNamara's suspicions. Since the photocopying of the letter merely memorialized McNamara's observations and "provided a means to verify any subsequent recounting of them," *Fortna,* 796 F.2d at 738, the photocopying was also proper and not an additional intrusion.

In this regard, I note that reading and photocopying the letter is far less intrusive than other searches upheld by the Second Circuit, such as puncturing holes in suit-

---

**3.** As discussed, *infra,* the Second Circuit has addressed the constitutionality of opening cartons and screening films during a border

search under the First Amendment to uphold obscenity laws.

case linings, *see United States v. Caro*, 637 F.2d 869 (2d Cir.1981), as well as strip searches, *see U.S. v. Moody*, 649 F.2d 124 (2d Cir.1981). A person may even be detained for at least a day and a half, handcuffed to a bed, upon reasonable suspicion that he is an alimentary canal smuggler. *See United States v. Esieke*, 940 F.2d 29 (2d Cir.1991).

### B. CLAIMS OF DEFENDANT MARTHA LINDO DEDIAZ

■ Defendant Lindo also challenges the search and seizure of the letter on the grounds that the Government's conduct violated her Fourth and First Amendment rights. Evidence obtained from a search of a third person's property ordinarily does not infringe a claimant's Fourth Amendment rights. *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), *reh'g denied*, 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979). "[A] third party has standing to challenge the constitutionality of a search only when such individual has a 'legitimate expectation of privacy' in the premises or items searched." *United States v. Knoll*, 16 F.3d 1313 (2d Cir.1994) (citing *Rakas*, 439 U.S. 128, 143, 148–49, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Although I permitted Lindo to participate at the hearing, I initially limited her questioning to the issue of her standing.

Lindo's position rests on the unsupported assumption that she has a legitimate expectation of privacy and a possessory interest in the envelope and its contents. Although courts ordinarily recognize a legitimate expectation of privacy in letters and other sealed packages, *United States v. Jacobsen*, 466 U.S. 109, 114, 104 S.Ct.

1652, 80 L.Ed.2d 85 (1984); *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992) (both senders and addressees have reasonable expectation of privacy in packages or closed containers), neither Lindo nor Soto can reasonably have such an expectation as to the sealed envelope. As discussed, *supra*, customs agents have broad authority to conduct routine border searches of items brought by persons entering the country, including sealed envelopes. Therefore, Lindo has no standing since she has no legitimate expectation of privacy in keeping the contents of a sealed envelope private at a routine border search, whether or not the envelope was addressed to her.

■ Even if Lindo were to have standing, she has not offered any persuasive reason why the search and seizure of the envelope was unlawful. Lindo improperly relies on 19 C.F.R. § 145.3 (1995)[4] and 19 U.S.C. § 482 (1978)[5] in arguing that McNamara could not open the envelope if he did not reasonably suspect that it contained merchandise which was imported contrary to law, such as contraband or a dutiable item. 19 C.F.R. § 145.3 is inapplicable since it only applies to "letter class mail." 19 C.F.R. § 145.1(b) defines "letter class mail" as "any mail article ... mailed at the letter rate or equivalent class or category of postage." The envelope in question was carried by Soto rather than mailed.

Moreover, 19 U.S.C. § 482 is equally inapplicable since it regulates searches of merchandise already in the country, rather than at the border. *See e.g., Glasser*, 750 F.2d 1197; *Taghizadeh*, 41 F.3d at 1265 ("Section 1582 ... deals with customs searches *at the border*, while section 482

---

**4.** 19 C.F.R. § 145.3(a) provides in pertinent part:

> ... Customs officers and employees may open and examine sealed letter class mail subject to Customs examination which appears to contain matter in addition to, or other than, correspondence, provided they have reasonable cause to suspect the presence of merchandise or contraband.

**5.** 19 U.S.C. § 482 provides in pertinent part that customs officers are:

> authorized to ... search any trunk or envelope, wherever found, in which they may have reasonable cause to suspect there is merchandise which was imported contrary to law.

deals with searches of items 'wherever found,' in which agents suspect there is contraband or dutiable goods that '[were]' already imported illegally"). Under the broad authority conferred by 19 U.S.C. § 1582 upon customs inspectors to conduct border searches, McNamara properly opened, read and photocopied the letter.

■ Lindo's claim that the search and seizure of the letter violated her ·First Amendment rights is also meritless. Customs officials may screen materials to enforce laws without violating the First Amendment. *See United States v. Borello,* 766 F.2d 46 (2d Cir.1985) (upholding screening of materials to enforce obscenity laws). Courts have also upheld a limited reading or perusal of documents found during a border search to identify the objects themselves. *See e.g., Heidy v. United States Customs Service,* 681 F.Supp. 1445 (C.D.Cal.1988); *Church of Scientology v. Simon,* 460 F.Supp. 56 (C.D.Cal.1978), *aff'd.,* ·441 U.S. 938, 99 S.Ct. 2153, 60 L.Ed.2d 1040 (1979).

Lindo bases her contention that the search "chilled" her speech on a contorted reading of dicta and footnotes in *Ramsey,* completely missing the essence of the Court's ruling. Besides noting that the existing statutory and regulatory protection afforded mailed letters does not chill free speech, the Supreme Court implicitly approved border searches of articles or containers. *See Ramsey,* 431 U.S. at 623, 97 S.Ct. 1972 ("the existing system of border searches has not been shown to invade protected First Amendment rights").

Lindo also incorrectly relies on *Wolff v. McDonnell* to argue that the First Amendment prohibits the reading of correspondence. *See* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Wolff,* which addressed the opening of attorney-prisoner mail in the context of the First Amendment and other rights, not only upheld the opening of attorney mail in a prisoner's presence, but also generally approved a regulation permitting perusal of incoming mail. *Id.* at 575–77, 94 S.Ct. 2963.

Last, counsel for Lindo also argues·that his client had standing to participate in the examination of Government witnesses with respect to Soto's motions to suppress evidence found subsequent to the border search, because such ·evidence was "fruit of the poisonous tree" derived from the illegal search of the envelope. That issue need not be reached in light of my findings and recommendation that the ·Government properly conducted a border search of Soto's property, including the envelope.

However, I acceded to the Government's request at the hearing that it be allowed to call Agent Ahearne to establish that the search warrant leading to Soto's arrest and search of Soto's briefcase resulted from sources independent of the letter copied by McNamara in Miami. Agent Ahearne, who is the agent in charge of this case, testified that the Government did not learn of the letter in Soto's possession until July 6, 1995, one day *after* customs inspectors discovered cocaine in the third paper roll. Tr. 89. This testimony directly contradicts the Government's position in its memorandum that customs inspectors found nothing in an initial inspection of the first two rolls of paper and were prompted to search the third roll only upon learning about the letter in Soto's possession. *See* Government's Memorandum of Law in· Opposition to Defendant Soto's Pretrial Motions at 4. Although such an inconsistency does not affect the resolution of the motions at hand, it leaves disturbing implications as to the rest of the Government's case if the Government cannot present a consistent view·even as to the basic facts surrounding the investigation.

## II. THE CONSENT SEARCH

Soto objects to the warrantless search of Londono's apartment and to the subsequent seizure of the contents of his briefcase left in her living room. In general, a warrantless search may be made without violating the Fourth Amendment if "the authorities have obtained the voluntary

consent of a person authorized to grant such consent." *United States v. Hernandez,* 85 F.3d 1023 (2d Cir.1996) (quoting *United States v. Elliott,* 50 F.3d 180, 185 (2d Cir.1995), *cert. denied,* 516 U.S. 1050, 116 S.Ct. 715, 133 L.Ed.2d 669 (1996)). The Second Circuit has repeatedly held that "1) consent to a search by one with access to the area searched, and 2) either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." *United States v. Gonzalez Athehorta,* 729 F.Supp. 248, 256 (E.D.N.Y. 1990) (quoting *United States v. Gradowski,* 502 F.2d 563, 564 (2d Cir.1974) (per curiam)). If the consent is not coerced, then the subsequent search is reasonable. *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *United States v. Garcia,* 56 F.3d 418, 422 (2d Cir.1995). The burden is upon the prosecution to establish by a preponderance of the evidence that the consent is valid. *United States v. Matlock,* 415 U.S. 164, 165–66, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Deutsch,* 987 F.2d 878, 883 (2d Cir.1993).

■ The Government relies on *United States v. Gillette,* 383 F.2d 843, 848–49 (2d Cir.1967) to argue that Soto's motion should be denied as a matter of law because the defendant did not support it with an affidavit based on personal knowledge. As I noted on the record, this argument fails since the defendant's affidavit that the briefcase was locked is based on personal knowledge sufficient to require a hearing on the motion. *See United States v. Isom,* 588 F.2d 858, 861 (2d Cir.1978) (justifiable expectation of privacy exists in contents of locked articles which are brought to a host's premises); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ I find that Londono voluntarily consented to a search of her apartment. Delcasino testified that Londono remained cooperative and pleasant throughout the questioning and subsequent consent search. She first agreed orally to the search and then signed a consent form written in Spanish. No evidence exists that the officers coerced her to sign the form. She understood Delcasino's questions in English and gave directions to her apartment in English.

■ Moreover, I find that Londono had authority to consent to a search of her premises which led to the search of Soto's briefcase. Since Londono is a tenant of the apartment, she has both access to the living room which was searched and authority over it. *United States v. Matlock,* 415 U.S. 164, 170–72, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

■ I also find Delcasino's testimony credible that he found Soto's briefcase open. Thus the warrantless search and seizure of the contents of Soto's briefcase was lawful under the plain view doctrine since the briefcase was open. *See Arizona v. Hicks,* 480 U.S. 321, 323, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The seizure of the items did not violate Soto's Fourth Amendment rights and the motion to suppress is denied.

■ At the conclusion of the hearing, Soto moved to extend the hearing and for issuance of a subpoena directing Fannie Londono to testify. His counsel claimed that she had been in regular contact with Londono and had expected Londono to appear at the hearing. Tr. 41. She also claimed that Soto's prior counsel had been in touch with Londono and that Londono had told both attorneys that she did not voluntarily consent to the search of her apartment.

However, in his motion papers challenging the lawfulness of the search of Londono's apartment, Soto raised only the issue that Londono "did not have the lawful authority or [his] permission to consent to a search" of his locked briefcase. *See* Soto's affidavit in support of the motion to

suppress at ¶ 11. He never presented any argument, let alone an affidavit from Londono or any other person with knowledge, that Londono did not voluntarily give her consent. I thus gave Soto one week to supplement his motion and to explain his delay in belatedly seeking to compel Londono's appearance.

Federal Rules of Criminal Procedure 12(c) states that a district court may "set a time for the making of pretrial motions or requests." *See also United States v. Forrester*, 837 F.Supp. 43 (D.Conn.1993). A party waives his or her right to file motions to suppress if the motions are not raised by the date set by the court. *United States v. Howard*, 998 F.2d 42, 52 (2d Cir.1993); *see* Fed.R.Crim.P. 12(f). Failure to present a certain claim is likewise waived. *See* Fed.R.Crim.P. 12 Advisory Committee's note to 1974 amendment ("the purpose behind the amendments to Fed.R.Crim.P. 12 is to 'encourage the making of motions prior to trial, whenever possible, and in a single hearing rather than in a series of hearings' "). A district court, however, may grant relief from the waiver upon a showing of "(1) cause for the defendant's non-compliance, and (2) actual prejudice arising from the waiver." *Howard*, 998 F.2d at 52.

Soto provides no basis in his additional affidavit for extending the hearing in order to present his new argument for suppression. He merely submitted a further affidavit reiterating that the briefcase had been closed. I recognize that if Londono indeed has had a change of heart in her willingness to testify, Soto may not have been able to obtain an affidavit from Londono. However, he could at least have presented affidavits from his current attorney and prior attorney indicating the extent of their contacts with Londono and whether Londono had come to the court house for the aborted hearing scheduled on March 14, 1996. He did not do so, nor did his counsel advise the court at the March 14th hearing that Londono was there ready to testify. Thus, he has pre-sented no credible evidence warranting a further hearing on the issue of whether Londono consented to the search of her apartment voluntarily. Similarly, he made no showing for his failure to articulate this ground for suppression, notwithstanding the many opportunities he had to raise this issue. Thus, Soto's request for a subpoena and to extend the hearing to present a new argument is denied.

## III. MIRANDA RIGHTS AND POST-ARREST QUESTIONING

As discussed in greater detail on the record after the hearing, see Tr. at 113, I find under the "totality of the circumstances" that defendant voluntarily waived his *Miranda* rights and voluntarily made the statements. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Lopez read from a rights card and translated the rights verbatim in Spanish. *See* Government Exhibits 2 and 3. After each right, Lopez paused to confirm that Soto understood and defendant answered affirmatively. Soto understood the nature of the rights being read that were given to him and possessed competency to waive his *Miranda* rights. Thus, the government proved by a preponderance of the evidence that the statements were voluntary and Soto's Fifth and Sixth Amendment rights were not violated.

### *CONCLUSION*

For the foregoing reasons, I respectfully recommend: (1) that the motions to suppress the letter found in Soto's briefcase during the border search be denied; (2) that the motion to suppress the contents of Soto's briefcase seized during the consent search of Londono's apartment be denied; (3) that the motion to extend the hearing and for issuance of a subpoena directing Fannie Londono to testify be denied; and (4) that the motion to suppress Soto's post-arrest statements be denied.

A copy of this Report and Recommendation is being sent on this date by Federal

Express or hand to all the parties listed below. All objections must be filed with the Clerk of the Court, with a copy to the undersigned, by August 20, 1996. Failure to file objections within the specified time waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

**SO ORDERED.**